Thomas HORN, et al.  Plaintiffs,

v.

Robert McQUEEN, et al.  Defendants.

No. CIV.A. 98–591–C.

United States District Court,
W.D. Kentucky,
Louisville Division.

Dec. 1, 2004.

Douglas C. Michael, Lexington, KY, pro se.

Alfred H. Sigman, Sigman, Lewis & Feinberg PC, and Todd F. Jackson, Lewis, Feinberg, Renaker & Jackson, PC, Oakland, CA; David M. Cook, Cincinnati, OH, and E. Douglas Richards, Miller, Griffin & Marks PSC, Lexington, KY, for Plaintiffs.

Barbara B. Edelman, Dinsmore & Shohl, Lexington, KY; Christopher Tyson Gorman, Donald J. Kelly, M. Stephen Pitt, Merrill S. Schell, Wyatt, Tarrant & Combs LLP, Griffin Terry Sumner, Jason Renzelmann, Sheryl G. Snyder, Frost Brown Todd LLC, John J. McLaughlin, Sherry P. Porter, Goldberg & Simpson, Louisville, KY; D. Kirk Shaffer, Stokes, Bartholomew, Evans & Petree, Brad A. Lampley, Joel T. Galanter, and T. Steven Perry, Stokes, Bartholomew, Evans & Petree, Nashville, TN, for Defendants.

## ORDER

COFFMAN, District Judge.

On July 29, 2002, this court found the defendants liable for breach of fiduciary duty in their roles as trustees of an employee stock ownership plan ("ESOP") in violation of ERISA § 406, 29 U.S.C. § 1106. *Horn v. McQueen*, 215 F.Supp.2d 867 (W.D.Ky.2002).[1] The court determined that in the case of such a breach, "loss will be measured as the difference between what the ESOP paid for the USCC

---

1. Because the July 29, 2002, opinion recounts the facts of this case in detail, the court will not address them in this order.

stock and its fair market value at the time of transaction, plus interest." *Id.* at 881. The court found that the ESOP borrowed a total of $34,427,353 to acquire approximately 66 percent of the outstanding shares of USCC. *Id.* at 872. The court also referred to a special master the matter of determining the fair market value of the company stock as of March 15, 1994. *Id.* at 891. The special master was instructed to "review the testimony of Kerrick, Risius, and Elsten[2] and issue a report within six months of the date of referral, as to (1) the value of the USCC stock purchased by the ESOP in March, 1994, (2) the rationale employed in finding this value, and (3) as to each expert who testified at trial, an explanation of which portions of that expert's testimony the special master finds credible, and which portions the special master finds not credible, and why." *Id.* The parties objected to the findings in the special master's initial report. Following a hearing on those objections, the court resubmitted the case to the special master, who issued a supplemental report. The court heard oral arguments on the defendants' objections to the supplemental report on November 12, 2004. This matter is now before the court on the special master's supplemental report regarding the value of the USCC stock purchased by the ESOP in March 1994 and the issue of prejudgment interest for any overpayment.

## I. Special Master's Findings Concerning Valuation

In addition to instructing the special master to consider the reports and testimony of Kerrick, Risius, Gravitt, and Elsten, the court instructed the special master that "[i]f, and only to the extent that, the value of the USCC stock remains ambiguous after the special master has examined the evidence, the ambiguity is to be resolved against the defendants." Docket No. 230 (citing *Secretary of U.S. Dept. of Labor v. Gilley,* 290 F.3d 827, 830 (6th Cir.2002)).

After considering the experts' evidence, the special master determined that the value of USCC stock purchased by the ESOP in March 1994 was $26.31 million. Supplemental Special Master's Report ("Supp.SMR") at 4. The special master also concluded that there were no ambiguities to resolve. Special Master's Report ("SMR") at 52.[3] Having found the special master's final report, with its supplement, to be thorough and well-reasoned, the court will adopt the special master's findings in their entirety.

## A. General Principles of Valuation

■■■ The special master first addressed general principles relevant to valuations of the type engaged in by the experts. The special master noted that adequate consideration is defined as fair market value, or the price at which an asset would change hands between a well-informed and willing buyer and seller, citing 29 U.S.C. § 1002(18)(B) and DOL Prop. Regs., 53 Fed.Reg. at 17,634. SMR at 3. The special master noted factors considered in valuing a company, including the nature, the industry outlook, earning capacity, and the price of comparable companies. SMR at 3–4.[4] Three

2. This instruction was expanded to encompass the defendants' expert Gravitt by order dated July 1, 2003. (Docket No. 217)

3. In his initial report, the special master had determined the value of the stock to be $24.51 million. SMR at 47. This discrepancy resulted from an erroneous correction made by the

special master before issuing the initial report. Supp. SMR at 5.

4. The full list includes (A) the nature and history of the business, (B) the general economic outlook and outlook of the specific industry, (C) the book value of securities and financial condition of business, (D) the earn-

general approaches are used in applying these factors: (1) the income approach, which estimates the future economic benefits for the company's owner and discounts them to present value using a discount rate factoring in risk and the time value of money; (2) the market approach, which looks at the price of comparable companies in a fair, efficient and fully-informed market; and (3) the asset approach, which is based on total fair market value of the company's net assets. SMR at 4–5. With these general principles in mind, the special master considered the evidence of each expert.

## B. Kerrick Report

■ Kerrick, one of the defendants' experts, estimated the total value of USCC to be $52.15 million in March 1994. SMR at 6.[5] The special master found this conclusion not credible, noting that Kerrick's testimony on the weighting process was conclusory and that the valuation methods were applied improperly in his report. SMR at 7, 19.

Kerrick used three valuation methods which accounted for 95% of the value of the company; all of these methods were based on the income approach. SMR at 7. The "capitalization of earnings" method, which used a weighted average of past years' income with a capitalization rate assigned to convert that income stream into perpetuity, was flawed because the 1993 income (which received the most weight) was based on an extrapolation from income during the first ten months of the year despite substantial year-end expenses, including $1.75 million in bonuses to owners. SMR at 8–9. The special master rejected Kerrick's attempt to reconcile these expenses by adding back certain other expenses—Kerrick had failed to take into account adjustments that should have been made in the other direction, and certain other expenses should not have been added back, making the adjustment look haphazard. SMR at 8–10. Kerrick further failed to justify the 11% discount rate on excess earnings. SMR at 10.[6] The special master also found Kerrick's reliance on past earnings as a measure of future earnings questionable where the firm's earnings were not stable; the special master also questioned the need to rely on past earnings since Kerrick was able to project future earnings. SMR at 10.

The most heavily weighted method, the "capitalized excess earnings" method, determined the fair market value of the business's net tangible assets, multiplied that value by an estimated fair rate of return, subtracted the resulting value from the business's weighted average net income to find the return on intangible assets, and multiplied (or capitalized) the result by estimating fair return on intangibles to determine the value of the firm's intangible assets. SMR at 11. The method determined the value of the company by adding the values of the tangible and intangible assets. SMR at 11. The special master found that the method suffered from the same improper calculation of 1993 net income. SMR at 12. The special master also criticized the use of the book

---

ing capacity of the company, (E) the dividend-paying capacity of the company, (F) the firm's goodwill or other intangible value, (G) the market price of similar publicly traded corporations, (H) the marketability of the firm's securities, and (I) the company's control premium. SMR at 3–4 (citing DOL Prop. Regs. § 2510.3–18(b)(4), 53 Fed.Reg. at 17,638).

**5.** This would value the stock purchased by the ESOP at $36.38 million ($52.15 million × 66%).

**6.** This is significant because, under an income approach, the smaller the discount rate on the income, the higher the resulting value of the company.

value of net tangible assets instead of the higher market value, which had the effect of inflating excess earnings and the value of the business; Kerrick should have used the fair market value, as the IRS requires for valuations. SMR at 12. The excess earnings capitalization rate of 16% was improperly low because it included an adjustment for a 9% steady growth rate despite the expectation that USCC's growth would level off after two years. SMR at 12–13. Finally, the valuation should have used future rather than past earnings since future earnings had been estimated. SMR at 13–14.

The third valuation method, the "discounted future earnings" method, predicted the company's future earnings over a specified period, projected a "residual value" of the business at the end of the period, and then discounted that value to obtain the present value of the company. SMR at 14. Kerrick used two methods to determine the residual value—under the income residual method, the residual value was determined by capitalizing the income of the final period; under the net asset residual method, it was determined as the net asset value of the business at the end of the period. SMR at 14.[7] The special master described the method of valuing the business by discounting its expected future economic income as the most proper approach. SMR at 15. Kerrick's method was flawed, however, because it failed to subtract the value of the company's debt from the value of the company to the stockholders. SMR at 15–17. The income residual calculation did not exclude interest expenses, or the income due to debt holders rather than equity holders, from

the income value. SMR at 16. The special master found Kerrick's testimony that such an adjustment was unnecessary not credible. SMR at 16. The net asset residual was flawed because it took into consideration the value of the firm's debt five years into the future but not the present value of that debt; more importantly, while Kerrick's testimony involved the bases for his income statement projections, he failed to provide a justification for his projected balance sheets, from which the debt value was drawn. SMR at 16–17.

The defendants argue that Kerrick's failure to subtract debt from his calculations is not fatal because the debt was factored into the higher discount rate used for projected cash flows; but the special master noted that the lack of detail in Kerrick's report concerning the discount rate prevents the court from knowing whether the debt was taken into consideration. Supp. SMR at 13–14. The special master also found in any event that Kerrick's discount rate numbers were not credible because of Kerrick's failure to explain the basis for the numbers. SMR at 23–24; Supp. SMR at 14. The court agrees with the special master's reasoning and conclusions concerning Kerrick's failure to subtract debt from his calculations.[8]

The special master also noted that Kerrick failed to disclose the basis of the projected revenues and expenses, noting Kerrick's testimony that they "appeared to be reasonable" based on his understanding of the contracts in place and outstanding proposals. SMR at 17–18. Finally, the special master noted that Kerrick's net asset residual unrealistically assumed liq-

---

7. These two methods together received 53% of the weight of all the valuation methods. SMR at 14.

8. With regard to Kerrick's testimony, the court in its liability opinion expressed its own concerns about the credibility of Kerrick's

testimony, including his downplaying of time restraints, his testimony concerning the existence of a lower draft valuation, the vagueness of his testimony, and his inability to recall whether evidence of preliminary calculations was contained in the files. *Horn*, 215 F.Supp.2d at 883–86.

uidation after five years (which was inconsistent with his other methods, which focus on future earnings as measure of value) and failed to account for income tax on liquidation. SMR at 18–19. For these reasons, the special master found Kerrick's evidence not credible. SMR at 19. The court finds Kerrick's valuation not credible for the reasons stated by the special master.

## C. Risius Report

■ The plaintiffs' expert, Risius, valued the company at $31.21 million in March 1994. SMR at 19–20. The special master found the Risius report a conceptually complete application of the discounted cash flow method, the preferred valuation method, and, except with regard to capital expenditures, sound and credible. SMR at 33.

### 1. Risius's discounted cash flow method

Risius's discounted cash flow method was theoretically identical to Kerrick's "discounted future earnings" method. SMR at 20. The special master found significant differences in its application, however. Risius substantiated his projected revenues for each company facility and his projected overall operating expenses, comparing them to the Kerrick and Bank of Louisville projections; Risius's projections for earnings were significantly lower than Kerrick's but justifiable, whereas Kerrick relied on unstated assumptions. SMR at 20–21. The special master found the detailed Risius projections reasonable despite the defendants' contesting Risius's assumptions of no growth projected in future contracts and that USCC facilities would operate at less than full capacity. Supp. SMR at 10.

Risius set his discount rate at 17.5%, calculated using the weighted average cost of capital ("WACC") (a combination of the debt and equity discount rates). SMR at 21. The special master noted that Risius's equity rate of 25.6% was derived from market estimates, based on qualitative determinations, and constituted the sum of the risk-free rate of return, industry risk, company size, and company-specific risk. SMR at 21–22. The special master found Risius's calculation of the discount rate credible. SMR at 22. The special master disagreed with Gravitt's criticism that Risius failed to justify the rate and ignored the firm contractual nature of projected revenues. SMR at 22–23. Risius had considered aspects of USCC reducing its risk, including the government's low risk of default on its contracts and rapid growth in the industry; while a different expert might have come up with a different number, the special master found no basis to conclude that Risius did not consider appropriate factors. SMR at 22–23.

In response to the defendants' argument that the stability of the firm's existing contracts reduced the proper discount rate, the special master commented on the volatility of the firm's projected earnings (as noted by each expert) and the risky prospects for growth. SMR at 25. Further, the special master found Risius's 25.6% equity rate more credible than Kerrick's 20% rate because Risius was clearer about the source of significant data used and provided some narrative supporting his judgment, whereas Kerrick provided details in the form of numbers without any substantiation. SMR at 23–26. The court agrees with the special master's conclusions concerning the credibility of Risius's equity rate, including his reasoning concerning the stability, or lack thereof, created by the firm's existing contacts.

In response to the defendants' objection that Risius should have used the 14.5% "smoothed equity premium" from the Grabowski/King study to account for industry risk and company size, the special master noted that the defendants have failed to

justify why the 17.2% "unsmoothed equity premium" is not more appropriate despite the relatively high value of USCC; it was also not clear that USCC was comparable with the exchange-traded companies included in the study. Supp. SMR at 7. Further analyzing Risius's rate, the special master concurred with the defendants' adoption of a risk-free rate of 6.99%. Supp. SMR at 8. The special master further agreed with the defendants on the importance of not double-counting company-specific risk by factoring it into multiple components of the calculation but found that Risius's report and testimony substantiated that he had properly examined the relevant factors. Supp. SMR at 8. The special master also noted that the defendants failed to support their assertion that a lower company-specific adjustment was appropriate. Supp. SMR at 9. Risius could have chosen a lower adjustment, but the special master found a company-specific adjustment to 25.6% was not unreasonably high even if taken from the defendants' assumed base rate of 21.49% (the 6.99% risk-free premium plus the 14.5% "smoothed equity premium"). Supp. SMR at 9. The special master ultimately favored the evidence in the Risius report over the speculations of the defendants' counsel. Supp. SMR at 9. While the court notes that the defendants believe the equity rate to be the most important factor in these calculations, there is simply no basis upon which to conclude that another rate would be more appropriate than Risius's number. The special master found no impermissible double-counting between Risius's discount rate and what the defendants argued were

low cash flow estimates. Supp. SMR at 10. The court agrees with the findings of the special master and finds no reason to believe that Risius has impermissibly double-counted the company-specific risk or used an unreasonably high company-specific or equity risk rate.

The special master dismissed criticism of the Risius report as being produced in 1997 as unfounded because it properly used only data available in March 1994.[9] SMR at 26–27. In addition, while Risius failed to justify his estimate of a 60:40 equity-to-debt ratio for USCC, the special master found the ratio reasonable because it was close to the 67:33 ratio based on the adjusted book value, total value of equity, and total value of debt in Kerrick's report. SMR at 27–28.

Gravitt criticized Risius for failing to incorporate growth opportunities; the special master found this criticism unfounded in light of Risius's testimony that the firm's growth potential was recognized in actual revenue projections and a growth factor applied to the residual period. SMR at 28–29.[10] The defendants object to Risius's projected 3% growth rate, arguing for a higher growth rate in contract prices; the special master, however, found that the Risius report credibly assumed that the government would limit the increase in growth of its contract prices. Supp. SMR at 11. The defendants also argue that Risius unreasonably assumed that facilities would be operated at less than full capacity, but the special master noted that only Kerrick assumed full capacity—Risius's use of an average of the estimates of Kerrick and others was not unreasonable.

9. To the extent that Risius used a 1997 Grabowski/King study that would have been unavailable in March 1994, the court finds that such error does not materially affect the credibility of the Risius report.

10. The growth factor applies for the residual period after the five-year horizon. It ac-

counts for normal growth in earnings at the rate of inflation during the residual period, during which an analyst assumes no growth in business, but rather that the business will continue in its projected state indefinitely. The special master noted that this growth factor actually works in the defendants' favor, despite their objections. SMR at 28–29.

Supp. SMR at 11. Finally, the defendants object that Risius failed to consider new business opportunities available to USCC. The special master noted that Risius considered three projects that were either newly completed or under construction in making his revenue projections; because the nature of the firm's sales involve "large, discrete, nonuniform contracts" that are inherently unpredictable, Risius properly declined to speculate as to growth in the absence of evidence of new contract negotiations or the firm's financial ability to expand operations. Supp. SMR at 12. The court agrees with the special master's reasoning and conclusions concerning Risius's projected growth. Risius was appropriately conservative in making his projections, particularly in light of the lack of evidence pointing persuasively toward future growth.

### 2. Errors in Risius report

The special master found Risius's deduction of $2 million allocated to capital expenditures in 1995 justified. SMR at 30. While the special master recognized the importance of considering capital expenditures in estimating future cash flows, he found that Risius had failed to justify his assumption of $1 million in capital expenditures for all years. SMR at 30. Because the estimate was not derived from a percentage of revenue, did not include an explanation of why such deductions were required given the fact that USCC did not own many of its properties, and did not include an explanation of why the figure would not grow, the special master found the figure unsubstantiated. SMR at 30–31. The court agrees with the special master's finding that the $1 million capital expenditure figure is unsubstantiated and that discarding the assumption will not significantly distort the valuation.

Risius also subtracted from the value of the company the present value of future payments owed to Clifford Todd under an employment, non-compete, and consulting agreement. SMR at 32. The special master determined that the contractual obligation should be taken at face value as a contract for future services rather than existing debt and, therefore, was not properly subtracted from the value of the company to determine the company's equity value. SMR at 31–33.

Finally, the special master did not consider Risius's guideline company method calculations because Risius discarded them. SMR at 20. The defendants argue that Risius's errors, including his initial failure to account for a four-to-one stock split and attempts to correct the problem by making unjustified adjustments, raise credibility issues. The defendants further claim that Risius's decision to discard the $105 million figure calculated under the guideline company method erodes his credibility, but the special master, noting that Risius admitted and discussed his error, found Risius's explanation credible. Supp. SMR at 19–20. The special master also found the $105 million figure not relevant to the value of the USCC stock and noted that the defendants have admitted as much. Supp. SMR at 20. The court agrees with the special master's conclusions that Risius's report is credible despite the aborted use of the guideline method and that Risius's guideline approach is not the appropriate method of pinpointing a value of USCC stock.

With the exception of the adjustments required to remove assumed capital expenditures and the present value of payments to Todd (adjustments which do not affect Risius's basic projections and discounting), the special master found Risius's conclusions sound and credible. SMR at 33. The court agrees with these findings.

### D. Gravitt Report

■ One of the defendants' experts, Gravitt, did not independently calculate a

value for USCC stock; instead, using a guideline approach, he endorsed as reasonable a value of $33.4 million by comparing it to a guideline range of between $26.98 million to $91.4 million. SMR at 33–34. Gravitt found Kerrick's valuation reasonable and Risius's valuation unreliable. SMR at 34. The special master rejected this endorsement of Kerrick's valuation, noting that Kerrick failed to subtract debt while Gravitt properly did subtract the debt in applying his guideline approach; the special master found the criticism of Risius well-founded with regard to capital investments and payments to Todd, but not credible otherwise; and the special master adjusted and made use of Gravitt's guideline approach for estimating the value of the company. SMR at 34, 38–39, 44.

### 1. Gravitt's findings

The guideline approach used by Gravitt is a common application of the market-based approach, which calculates the value of the company by using a guideline measure which can be compared with the same guideline measure for similar publicly traded companies. SMR at 34–35. Risius and Kerrick both rejected this approach because of difficulty finding similar companies; Gravitt used four companies in his model. SMR at 35. Gravitt used as his guideline variable the ratio of market value of invested capital (MVIC) to earnings before interest, taxes, depreciation, and amortization (EBITDA). SMR at 35–36. Gravitt utilized the EBITDA for USCC and public companies and MVIC (the total value of debt and equity) for public companies from stock prices. SMR at 36. The special master noted that this method eliminates the importance of debt structure. SMR at 36.

Risius noted that Gravitt used the March 1994 stock prices for the publicly traded companies and that those prices had jumped by more than 60% each after December 31, 1993. SMR at 36. The special master adjusted the guideline approach to consider the prices at both dates because the sudden, large fluctuation dramatically affected the results and noted that if the market rate is to reflect true value, it is difficult to believe that the value of these companies nearly doubled in three months absent any fundamental changes in the companies or the industry. SMR at 36–37. Risius also objected to the size of Gravitt's adjustment to add back to the EBITDA amounts paid to owners, although not to the necessity of making some adjustment. SMR at 37. The special master did not find either expert's number lacking in credibility and made use of both. SMR at 37. Risius objected that one of the four companies was not publicly traded until August 1994 and should not have been used; the special master found that the probative value of that company's data outweighed the distorting effect. SMR at 37–38.

After making these adjustments to the Gravitt report's method, the special master found guideline values for December 31, 1993 between $42.4 and $47.9 million and for March 15, 1994 between $64.7 and $73.2 million. SMR at 39. The special master noted the limitations of this guideline approach from the lack of closely comparable companies—USCC was highly leveraged and closely held—and the failure to consider several years of data. SMR at 39–40. The special master found that these limitations affected the weight to be given to the approach, although it would be appropriate to use the results to check the reasonableness of the other experts' assumptions. SMR at 40–41.[11]

---

**11.** Gravitt, in using the guideline approach, likewise had not intended to assign a specific value to the USCC stock, but to establish a range of reasonable values. SMR at 40–41.

## 2. Gravitt's criticisms of Risius

Gravitt criticized Risius's failure to use USCC's historical results in making projections; but the special master noted that Risius used data from the three years ending December 31, 1993, and that Kerrick weighted these three years most heavily. SMR at 41–42.

Gravitt also criticized Risius for valuing USCC at less than Kerrick's adjusted asset value when the net tangible assets should have established a minimum value for the company. SMR at 42. The special master noted that Kerrick did not conduct the rigorous assessment required for proper application of his method and also that Kerrick's book value for December 31, 1993, was not reliable because of its use of an incorrect 1993 income and other discrepancies; given these problems with the Kerrick report, the special master found the difference between the experts' values not material. SMR at 42–43.

Regarding Gravitt's argument that Risius used projected net earnings that resulted in profits lower than USCC's historic profits, the special master noted that the projections were higher than management's projections and that Kerrick had used similar numbers. SMR at 43.

Gravitt argued that Risius's estimated increases in the value of USCC contracts lacked adequate supporting information, but the special master found that the increases reflect inflation and that reliable information on future inflation is not available. SMR at 43.

Finally, Gravitt noted that Risius had made assumptions about the renewal of a USCC lease in 1998 rather than determining whether the lease was actually renewed; the special master found that it would have been improper for Risius to consider information not available in March 1994 in making his valuation. SMR at 43–44.[12] The court agrees with the special master's conclusions concerning Gravitt's findings.

## E. Special Master's Valuation

■ The special master used Risius's discounted cash flow method to determine the proper value of USCC in March 1994 and used the ranges suggested by the guideline company approach to evaluate the results. SMR at 45.[13] Adjusting Risius's approach to add back the $1 million charged to capital expenditures, the special master arrived at $58.532 million as the total value of the company (debt plus equity) as of the transaction date. SMR at 45–46; Supp. SMR at 4.[14] The special master then subtracted the outstanding interest-bearing debt of $18.674 million (including the total reported debt minus accounts payable, unearned income, and accrued ex-

---

12. Because Elsten made no material conclusions regarding value and was not asked to assess the merits of the Kerrick or Risius report, the special master reviewed her testimony, but did not deem it material to valuation. SMR at 44. This court agrees.

13. The special master did not use Kerrick's method because he found Kerrick's estimates not credible; Gravitt's method was not designed to assign a particular value to the stock. While Risius's report was the only remaining expert opinion on valuation, the special master did not adopt Risius's position by default, as the defendants suggest. The special master used only the parts of Risius's report that he found credible and made simple mathematical adjustments to correct for those portions that he found not credible. In relying on the evidence of record to make his valuation finding, the special master properly declined to conduct an independent analysis. *See* Supp. SMR at 13.

14. *The special master mistakenly adjusted the experts' mid-year discounting convention to end-year for the fifth year in his initial report. The special master has corrected this error in his supplemental report; this accounts for the difference between the numbers in the initial and supplemental reports. Supp. SMR at 5.*

penses, which do not carry interest), which yielded an equity value for the company of $39.858 million. SMR at 46–47; Supp SMR at 4.[15] Multiplying this equity value by 0.66 to reflect 66% of the stock purchased by the ESOP yielded a $26.31 million value. SMR at 47; Supp. SMR at 4.[16]

## F. Marketability and Control Premium

██ Marketability and control premium adjustments are commonly made in valuing a closely-held company. SMR at 47. Kerrick concluded no discount for lack of marketability was necessary because other parties had indicated an interest in buying the firm and because of the required "put option" on the stock held by the ESOP; Kerrick did not discuss a control premium. SMR at 47–48. Risius concluded no discount for lack of marketability was necessary because of the "put option" and the fact that the ESOP held a controlling interest—as owner, the ESOP could obtain liquidity by selling the company. SMR at 48. Risius apparently incorporated the control premium into his valuation, which he calls a valuation for a "nonmarketable controlling-interest value." SMR at 48. Gravitt assumed that the two factors offset each other. SMR at 48. Because no expert thought an adjustment for marketability necessary, the special master did not make such an adjustment. SMR at 48. Risius did not explain the basis for his control premium, but the control premium incorporated by Risius benefited the defendants and was not objected to by the

plaintiffs so the special master found no ambiguity. SMR at 48–49.

## A. Other Evidence

### 1. Bank of Louisville evaluation

██ The defendants asked the special master to consider the Bank of Louisville's evaluation. The special master noted that the bank had conducted a substantial investigation upon which Risius and Kerrick relied, but the special master did not rely on the evaluation as a valuation. SMR at 49–50. Relying on this court's previous opinion, the special master found that the bank's concern was that it get paid, that it had no fiduciary relationship with the ESOP, and that the $34.4 million loan was secured by the full value of the company, not just the 66% of the ESOP shares, indicating that the bank believed that USCC as a whole was worth at least $34.4 million. SMR at 49–50; Supp. SMR at 18–19. The evidence had limited value because the bank's purpose and analysis were fundamentally different from those involved in a proper valuation of the stock. SMR at 50; Supp. SMR at 19.

The Bank of Louisville evaluation is not persuasive in determining the total value of the company for the reasons stated in this court's previous order and relied on by the special master. *Horn*, 215 F.Supp.2d at 889. The special master properly declined to consider the bank's evaluation.

---

**15.** In doing so, the special master rejected the defendants' argument that only long-term debt and not short-term debt should be subtracted. The special master noted that he was dealing with a valuation issue rather than a projection period issue and that short-term creditors have a claim to the firm's assets. SMR at 47. The court concurs with the special master's findings concerning short-term debt.

**16.** In response to the defendants' sheet of valuation numbers purporting to show that the special master's findings were at the low end of the permissible range, the special master made adjustments to the defendants' figures to subtract short-term interest-bearing debt and remove figures relying on Kerrick's unsubstantiated 20% discount rate debt. The remaining range calculated by discounted cash flows was from $31.2 to $39.9 million. Supp. SMR at 21–25.

## 2. Subsequent transactions

■ The defendants asked the special master to consider later transactions,[17] but the special master found that they were not determinative of the value at the time of the ESOP transaction. SMR at 50–51. Three and four years after the ESOP transaction was not sufficiently close in time to be considered comparable contemporaneous transactions when the horizon for the experts' estimates was only five years. SMR at 50–51. The first of the transactions when discounted yielded results between $31.8 million and $36.4 million, depending on whose discount rate was used. Evidence of the second transaction was based on a one-sentence description a "hefty" four years after the ESOP transaction. SMR at 50–51. The special master rejected similar arguments in his supplemental report. Supp. SMR at 17–18.

The court finds that the special master correctly declined to consider these subsequent sales. The cases cited by the defendants in support of their consideration are not persuasive. While *Estate of Kaplin v. Commissioner of Internal Revenue* found that "little evidence could be more probative than the direct sale of the property in question," the Sixth Circuit was considering a sale occurring two years later where the property had not been improved during that two-year period. 748 F.2d 1109, 1111 (6th Cir.1984). Likewise, *Estate of Jung v. Commissioner of Internal Revenue* noted that courts are required to consider subsequent sales of property when the properties are comparable. 101 T.C.

412, 431, 1993 WL 460544 (1993). In this case, however, the properties are not comparable. The changes in USCC over the three- or four-year period and the experts' five-year horizon indicate that these transactions are not reliable indicators of the value of USCC in March 1994.

## 3. Contemporaneous offers

■ Relying on the court's previous order, the special master found the contemporaneous offers alleged by the defendants vague, unsubstantiated, and not proper for consideration. SMR at 51. The special master correctly declined to consider these offers. In its order as to liability, the court found the Robertson, Stephens & Co. offer vague, using numbers that were "put forth prior to the performance of any due diligence and are generally unsupported." *Horn,* 215 F.Supp.2d at 888. At trial, the defendants presented this and other vague so-called offers only to show good faith, not as evidence of the value of the company. *Id.* These offers have no evidentiary worth in determining the value of USCC stock in March 1994.[18]

Because the court agrees with the special master's findings, the court will adopt his findings concerning the credibility of the experts' evidence and his determination of the value of USCC stock in March 1994. The court finds that the fair market value of the stock purchased by the ESOP was $26.318 million. Because the ESOP paid $34,427,353 for the stock, the court concludes that the ESOP overpaid in the amount of $8,139,116.[19]

---

17. The Whitney Group bought the ESOP's shares for $41 million in 1997. Correction Corporation of America bought the whole company in 1998 for $117 million.

18. The special master considered further submissions from the defendants but determined that they did not affect his determination. Supp. SMR at 27–28.

19. The court derived this number by subtracting the rounded debt figure contained in the special master's supplemental report, Supp. SMR at 4, from the rounded total value of USCC (equity plus debt), *Id.*, and then multiplying the difference by the 66.03% equity interest purchased by the ESOP, *see Horn,* 215 F.Supp.2d at 869. ($34,427,353— (($58.532 million—$18.674 million) × .6603) = $8,139,116)

## II. Prejudgment Interest

### A. Availability of Prejudgment Interest

Both parties have filed motions relevant to the availability and determination of prejudgment interest. (Docket Nos. 234 and 268) The defendants argue as an initial matter that prejudgment interest is not permitted under *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). In *Great–West,* the Supreme Court interpreted the language of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), allowing "other appropriate equitable relief" to bar suits for money other than suits for equitable restitution. *Id.* (*passim*) The defendants argue that "other appropriate equitable relief" in this case does not include prejudgment interest. The plaintiffs argue, in response, that they are entitled to equitable and remedial relief in their suit on behalf of the plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), as well as "other equitable relief" as individual plaintiffs under ERISA § 502(a)(3).

Section 502(a)(2) allows a civil action "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." ERISA § 409(a), 29 U.S.C. § 1109(a), in turn, makes fiduciaries liable for breaches of their fiduciary duties and specifies available remedies:

> The fiduciary is personally liable for damages ("to make good to [the] plan any losses to the plan resulting from each such breach"), for restitution ("to restore to [the] plan any profits of such fiduciary which have been made through use of assets of the plan by the fiducia-

ry"), and for "such other equitable or remedial relief as the court may deem appropriate," including removal of the fiduciary. *Mertens v. Hewitt Associates,* 508 U.S. 248, 252, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). *Mertens* distinguished between the broad relief available under § 502(a)(2) and the more limited "appropriate equitable relief" available under § 502(a)(3). *Id.* The Supreme Court also has found, however, that the broad recovery allowed under § 409(a) may inure solely to the benefit of the plan as a whole and not to individual participants. *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 140–42, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Because this court has concluded that the plaintiffs, as participants in the ESOP, have properly brought this claim on behalf of the plan for loss occurring to the plan, they are entitled to pursue the broad range of remedies available to the plan under § 409(a).[20] *Great–West,* which addresses only § 502(a)(3) and its "other appropriate equitable relief" provision, does not affect the availability of relief under § 502(a)(2). Because the plaintiffs may seek a wide range of relief under § 502(a)(2), the court need not address the availability of the requested relief under § 502(a)(3). *See Helfrich v. PNC Bank,* 267 F.3d 477, 481 (6th Cir.2001) (distinguishing between the two subsections and noting the "full gamut of legal equitable relief" available to individuals acting on behalf of plan).

The court has "wide latitude in compensating participants in an ESOP when a breach of fiduciary duty has been shown." *Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 444 (6th Cir.2002). This

---

**20.** The defendants argue that the plaintiffs may not seek such relief because the ESOP was terminated prior to the filing of this suit. The court rejects this argument because the loss to the ESOP, and, by extension, to the

ESOP participants, occurred prior to termination. Allowing an ESOP fiduciary to avoid liability for such loss by terminating the ESOP would also be contrary to the broad remedial policy evinced by ERISA § 409(a).

latitude includes the discretion to award prejudgment interest "in accordance with general equitable principles." *Ford v. Uniroyal Pension Plan,* 154 F.3d 613, 616 (6th Cir.1998) (allowing prejudgment interest in suit under § 502(a)(1)(B) for withheld benefits). Such interest simply compensates the plaintiffs for the "lost interest value of money wrongly withheld." *Id.* at 618. The court warned against excessive interest rates that would over-compensate plaintiffs and, in effect, constitute punitive damages instead of just making good the plaintiff's losses. *Id.* On the other hand, the court warned that "an exceedingly low prejudgment interest rate fails to make the plaintiffs whole by inadequately compensating him or her for the lost use of money." *Id.* The Sixth Circuit has noted that "[a]wards of prejudgment interest are compensatory, not punitive, and a finding of wrongdoing by the defendant is not a prerequisite to such an award." *Drennan v. General Motors Corp.,* 977 F.2d 246, 253 (6th Cir.1992). Thus, compensation concerns weigh heavily in the Sixth Circuit's consideration of "equitable principles."

Other circuits have expressed this equitable balancing in terms of fairness and compensation; factors considered by these circuits include whether the award of interest is sufficient to compensate the plaintiff, whether the award is fair, the presence or absence of bad faith, deterrence of delay in settling or paying claims, and the potential for unjust enrichment in the absence of interest. *See Mendez v. Teachers Ins. & Annuity Ass'n & College Retirement Equities Fund,* 982 F.2d 783, 790 (2d Cir.1992) (interest to be awarded only where "fair, equitable and necessary to compensate the wronged party fully;" upholding denial where plaintiff had already

received accrued interest); *Skretvedt v. E.I. DuPont De Nemours,* 372 F.3d 193, 208 (3d Cir.2004) (interest compensates prevailing party for its true costs, promotes settlement, and deters attempts to benefit from litigation delay and should be awarded unless inequitable; collecting cases on prejudgment interest); *Fritcher v. Health Care Service Corp.,* 301 F.3d 811, 820 (7th Cir.2002) (award of interest "a question of fairness;" failure to award interest provides incomplete compensation and gives defendant incentives to delay); *Landwehr v. DuPree,* 72 F.3d 726, 739 (9th Cir.1995) (in § 502(a)(3) case, finding award of interest "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities" and upholding denial of interest where defendant lacked bad faith); *U.S. Industries, Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1256–58 (10th Cir.1988) (asking whether award of interest is sufficient to compensate and whether award is fair; collecting cases on prejudgment interest), *implied overruling on other grounds recognized in Anixter v. Home–Stake Production Co.,* 77 F.3d 1215, 1231 (10th Cir.1996).

Some of these courts have explicitly found a presumption in favor of the award of prejudgment interest, particularly where the defendant has breached his fiduciary duties. *See Skretvedt,* 372 F.3d at 208 (3d Cir.2004) (interest to be awarded "unless exceptional or unusual circumstances exist making the award of interest inequitable"); *Fritcher,* 301 F.3d at 820 (interest presumptively available in ERISA cases); *U.S. Industries,* 854 F.2d at 1256–58 (interest normally awarded absent some justification for withholding). The court finds these considerations equally applicable under Sixth Circuit law.[21]

---

21. The cases cited by the defendants for the proposition that prejudgment interest is barred by *Great–West* are inapposite as none of those cases involved an award under § 502(a)(2). *Helfrich* denied a claim for equi-

table restitution under § 502(a)(3). 267 F.3d at 481. *Community Health Plan of Ohio v. Mosser,* like *Great–West,* involved an impermissible attempt to recover contractual reim-

In a similar case involving a breach of fiduciary duty by ESOP administrators, a district court in this circuit awarded prejudgment interest to make the ESOP whole, despite the court's finding that the defendants' conduct was not egregious and that some defendants did not act with the intent of personal gain. *Herman v. Hall Holding Co., Inc.*, 60 F.Supp.2d 755, 758 n.2 (N.D.Ohio 1999), *aff'd by Chao v. Hall Holding Co., Inc.*, 285 F.3d 415 (6th Cir. 2002).[22] In doing so, the district court noted that such interest is compensatory rather than punitive and that the defendants' willfulness is not determinative. *Id.* (citing *Drennan*, 977 F.2d at 252). The prejudgment interest rate selected in *Hall Holding* more than doubled the damages awarded to the ESOP. *Id.* at 759.

■■■ This court finds an award of prejudgment interest necessary to adequately compensate the ESOP, and by extension the plaintiffs, for the "lost interest value of money wrongly withheld." In addition to compensation concerns, fairness weighs in favor of an award of prejudgment interest. This court previously found:

> The evidence at trial showed that these defendants embarked upon creating an ESOP in order to retain control of their company; they settled upon a price with the selling principal without negotiation and agreed to a closing deadline imposed by that principal; they became trustees of the ESOP, while remaining corporate officers; they commissioned a valuation of the corporation's stock which was subjected to a compressed timetable, and for which they provided the projections, the end result of which was a value sufficient to consummate the transaction, but their primary review and analysis of which was merely to question why the corporation wasn't worth more.

*Horn*, 215 F.Supp.2d at 869. Although it was in the best interest of the ESOP participants to acquire the stock at the lowest possible price, "it is clear that the trustees were not looking at the transaction from that perspective." *Id.* The defendants in this case failed to act in objective good faith in conducting the stock purchase. Instead, the trustees engaged in the transaction in pursuit of their own self-interest with the goal of retaining control of the company. To the extent that the defendants benefited from their breach of fiduciary duty, they have been enriched at the expense of the ESOP participants. Furthermore, failure to award interest would leave the ESOP participants with grossly inadequate compensation for the time value of their money.[23] Given the general

bursement from a beneficiary under § 502(a)(3). 347 F.3d 619 (6th Cir.2003). In *Flint v. ABB, Inc.*, the Eleventh Circuit found that extra-contractual interest is not a "benefit due under the plan" under § 502(a)(1)(B) and posed a question in *dicta* about the availability of prejudgment interest under § 502(a)(3). 337 F.3d 1326, 1329, 1331 (11th Cir.2003). Likewise, in *Kerr v. Charles F. Vatterott & Co.*, the Eighth Circuit found extra-contractual interest impermissible under § 502(a)(1)(B); the court also found prejudgment interest unavailable under § 502(a)(3) where the plaintiff had already received interest accrued on the benefits in his defined contribution account and the trustee had not been enriched. 184 F.3d 938, 942, 946 (8th Cir.1999). None of these cases addresses the broader equitable or remedial relief available under § 502(a)(2). In addition, the Sixth Circuit has taken a broader view than the Eighth and Eleventh Circuits of the availability of prejudgment interest in §502(a)(1)(B) cases post-*Great-West*. *See, e.g., Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576, 585–86 (6th Cir. 2002) (suit to compel payment of long-term disability benefits).

**22.** The relevance of *Hall Holding* to the present case is discussed at length in the court's July 29, 2002, opinion.

**23.** The projections provided by the plaintiffs' expert indicate that the value of the money lost would have more than doubled since March 1994 if invested at the prime rate. *See* Risius Declaration, Docket No. 236.

presumption in favor of prejudgment interest to make the ESOP whole and the balancing of the equities, the court finds an award of prejudgment interest appropriate.

**B. Appropriate Rate of Interest**

In determining the appropriate rate of interest, the court is to choose a rate sufficient to compensate the ESOP adequately without over-compensating it. *Ford,* 154 F.3d at 618. The plaintiffs suggest three methods of bringing the loss forward from March 1994:(1) interest at the rate of prime plus 100 basis points; (2) interest based on the return that would have been received in a model balanced portfolio; and (3) an accounting of profits arising from the stock that could have been purchased at the fair market value of the stock with the amount overpaid by the ESOP.[24]

**1. Prime rate plus 100 basis points method**

The defendants argue that this suggested rate would be an impermissible award in excess of the statutory prejudgment interest rate. The court notes initially that it is not bound by the state prejudgment interest rate. *See Rybarczyk v. TRW, Inc.,* 235 F.3d 975, 985 (6th Cir. 2000) (looking "with disfavor on simply adopting state law interest rates" in ERISA cases); *Ford,* 154 F.3d at 618–19 (upholding district court decision not to use Michigan statutory rate where state rate intended to compensate for litigation

expense and would over-compensate because court already awarding fees and costs). Further, while the court may award prejudgment interest at the federal statutory post-judgment interest rate, 28 U.S.C. § 1961, *see Ford,* 154 F.3d at 619, the court is not bound to do so. *See Rybarczyk,* 235 F.3d at 986 ("This is not to say, however, that the § 1961 rate is the only permissible prejudgment interest rate.").

*Rybarczyk* and *Ford* indicate that the court has great latitude in designating a prejudgment interest rate that complies with equitable principles, as discussed above. After noting prior decisions allowing the use of the § 1961 rate, *Rybarczyk* also cited with approval awards of prejudgment interest tied to the prevailing market rate, "thus reflecting what the defendant would have had to pay in order to borrow the money at issue." 235 F.3d at 986 (citing *EEOC v. Wooster Brush Co. Employees Relief Ass'n,* 727 F.2d 566, 579 (6th Cir.1984) (using adjusted prime rate); *Katsaros v. Cody,* 744 F.2d 270, 281 (2d Cir.1984) (approving use of prevailing interest rates)). *Rybarczyk* ultimately upheld an award of prejudgment interest at the higher of the § 1961 rate or the rate of return actually realized on the funds; such a formula would compensate the plaintiffs and at the same time prevent the possibility of unjust enrichment. 235 F.3d at 986. The overarching concern in determining the rate of interest is adequate compensation of the ESOP for the lost interest value

---

**24.** The plaintiffs argue that the court should award interest based on returns available under prudent alternative investments as in *Harris Trust & Savings Bank v. John Hancock Mutual Life Ins. Co.,* 122 F.Supp.2d 444, 465 (S.D.N.Y.2000), and *Dardaganis v. Grace Capital, Inc.,* 889 F.2d 1237 (2d Cir.1989). The defendants counter that consideration of alternative investment opportunities is impermissible in this case because the ESOP was prohibited by statute from making alternative

investments and that an award of interest, therefore, is inappropriate. The court has already rejected this argument presented in a different form in its July 29, 2002, opinion where the court found that any overpayment for the stock constitutes loss to the ESOP under *Hall Holding,* even though the ESOP could invest only in stock of the company—the overpayment constitutes benefits that should have been received by ESOP participants.

of money wrongly withheld. *Ford,* 154 F.3d at 618. An award of interest based on the prevailing market rate would be appropriate to compensate the ESOP.

## 2. Model balanced portfolio method

The second suggested method, preferred by the plaintiffs, would base the prejudgment interest rate on the return the funds would have generated had they been invested in a balanced portfolio consisting of 60% stocks and 40% bonds; the plaintiffs would use the returns available under the Vanguard Stock and Bond Market Indices for the period between March 1994 and the date of entry of judgment. The plaintiffs argue that this model represents the investment that a prudent investor would have made over the same period and that such a model is appropriate because no readily identifiable alternative investments are available.

The Eleventh Circuit has found the district court within its discretion in awarding prejudgment interest under a model portfolio approach. *GIW Industries, Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.,* 895 F.2d 729, 733 (11th Cir.1990) (using model portfolio including investment of 35% of assets in long-term bonds and 35% in intermediate-term bonds where fund had actually invested 70% of assets in long-term bonds, resulting in breach of fiduciary duty). The plaintiffs further argue that the burden is on the defendants to prove that the actual return in the absence of a breach would have been less than the amount proposed by the plaintiffs. *See Dardaganis,* 889 F.2d at 1241 (noting common law presumption that, but for breach, trustee would have invested in most profitable alternative and that trustee bears burden of proving that fund would have earned less).

This method has the advantage of providing a more realistic rate of return on investable funds than would a prevailing market rate that would more appropriately measure the cost of borrowing funds. The defendants have not demonstrated that this approach is unjustified, as the court has rejected their argument that interest is improper because no alternative investments were available. The court concludes that this method is better suited to accomplish *Ford*'s goal of adequately compensating the plan for the lost time value of money.

## 3. Accounting for profits from additional shares

Under the third method suggested by the plaintiffs, the court would award the ESOP the additional shares that could have been purchased with the amount of the overpayment at the stock's fair market value as of March 15, 1994. The court would then require an accounting of the profits derived from the stock not held by the ESOP and award the profits derived from those additional shares.

The plaintiffs rely on the Sixth Circuit's finding in *Hall Holding* that "[t]he lower the price of the stock, the more shares that can be purchased by the ESOP, assuming the investor will invest the same amount without regard to price per share." 285 F.3d at 442–43. The district court in *Hall Holding,* however, actually adopted an adjusted prime rate from 26 U.S.C. § 6621 rather than such an accounting of profits from additional shares that could have been purchased. Case No. 94–CV–2236, at 3–4 (M.D. September 28, 1999). The Sixth Circuit language merely explained the court's conclusion that the ESOP had suffered a loss.

This method would complicate unnecessarily the determination of appropriate interest without presenting a more realistic rate of return on the funds withheld since it is questionable whether the plan would

have been able to purchase so many additional shares of USCC stock.[25]

The court concludes that the model balanced portfolio approach is the most appropriate method of awarding prejudgment interest in this case. Accordingly,

**IT IS ORDERED** that the special master's report is adopted. On the issue of damages, the court finds that the fair market value of the stock purchased by the ESOP in March 1994 was $26.31 million and that the plan overpaid for that stock in the amount of $8,139,116. The plaintiffs, on behalf of the plan, are awarded $8,139,116 for the loss to the plan. Within five days of entry of this order, the plaintiffs shall file a proposed mathematical calculation of the prejudgment interest that the court should award based on the damages awarded herein. The defendants may file objections to that calculation, limited to any mathematical errors made by the plaintiffs, within five days of its filing. The plaintiffs may reply within another five days, if desired, whereupon the court will enter final judgment. Within those memoranda, the parties shall address the effect of setting off the settlement payment already received from the total award on the court's order, if any.[26]

## REPORT OF THE SPECIAL MASTER

This matter is before me pursuant to the Order of Reference (Docket No. 221, entered August 13, 2003), in turn pursuant to the Memorandum Opinion and Order of July 29, 2002 (Docket No. 187) at 47–48, 215 F.Supp.2d 867, 891 (W.D.Ky.2003), as amended ultimately by the Amended Order dated November 19, 2003 (Docket No. 230). Pursuant to these orders, I am instructed, in pertinent part, to

> review the testimony of Kerrick, Risius, Gravitt and Elsten and issue a report ... as to (1) the value of the USCC stock purchased by the ESOP in March 1994, (2) the rationale employed in finding this value, and (3) as to each expert who testified at trial, an explanation of which portions of that expert's testimony the special master finds credible, and which portions the special master finds not credible, and why.

In addition, I am to

> refer to the holding in *Secretary of U.S. Dept. of Labor v. Gilley*, 290 F.3d 827, 830 (6th Cir.2002). If, and only to the extent that, the value of the USCC stock remains ambiguous after the special master has examined the evidence, the ambiguity is to be resolved against the defendants.... If the special master finds the value to be ambiguous, he shall so state in his report and give his reasons for this determination.

This report contains three parts which respond to each part of the court's order, although in a different sequence. In Part I, I review the credibility of each expert's testimony. In Part II, I present my conclusion, based on this review, that the value of USCC stock purchased by the ESOP in March 1994 is $24.51 million. In Part III, I explain why I believe that there were no ambiguities to be resolved, and hence no need to apply the rule in *Gilley*.

I received helpful suggestions from both parties [1] to an earlier circulation of a draft

---

**25.** The additional shares would have given the ESOP more than 90% of the company's stock.

**26.** At the oral argument on the defendants' objections to the Supplemental Special Master's Report the parties agreed that the settlement money already paid by other fiduciaries must be subtracted from the award made by the court.

**1.** I appreciate the timely work by both parties to respond to the tight deadline I imposed on them. However, I must confess that culling the good and well-reasoned suggestions from the Defendants' Reply was made difficult by the need to peel away enormous layers of epithet, accusation, invective and vitriol masquerading as argument. I refer to some of the language further in this report only in the footnotes and only where substantively rele-

of this report (herein "Draft Report"), which are denoted herein "Pl. Reply" and "Def. Reply." As directed by the Order of Reference, all three documents are included in this Report as Attachments A, B and C respectively.* I have indicated throughout this Report where I have responded in material fashion to those suggestions as well as other important changes made from the Draft Report.[2]

## I. EVALUATION OF EXPERT TESTIMONY

This report assumes familiarity with the court's Memorandum Opinion and Order of July 29, 2003 (Docket No. 187), 215 F.Supp.2d 867 (W.D.Ky.2003). I consider the facts and the conclusions of law determinative for my purposes. I will review here general valuation principles, and then turn to their specific application in this case.

### A. Applicable principles of valuation and review

Without recounting the entire case, I briefly note the legal background of the valuation issue at hand. The governing statutes in this case provide an exemption from otherwise prohibited sales of employer securities to employee stock ownership plans "if such acquisition ... is for adequate consideration." 29 U.S.C. § 1108(e). In the case of nonmarketable securities, as is the case here with USCC stock, Department of Labor regulations specify that "adequate consideration means ... a price not less favorable to the plan than the

price determined under section 3(18) of the Act." 29 C.F.R. § 2550.408e(d)(2). That statute, 29 U.S.C. § 1002(18)(B), in turn defines "adequate consideration" in the case of nonmarketable securities to be "the fair market value of the asset as determined by the fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." Regulations on the subject were proposed by the Secretary of Labor almost 16 years ago, 53 Fed.Reg. 17,632 (1988) ("DOL Prop. Regs.") and provide "a useful paradigm for asset valuation and analysis." *Montgomery v. Aetna Plywood, Inc.*, 39 F.Supp.2d 915, 919 (N.D.Ill.1998), *aff'd in part and rev'd in part*, 231 F.3d 399 (7th Cir.2000), *cert. denied*, 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001). The regulations, though never adopted, are treated as persuasive authority by most courts and writers. The proposed regulations state in pertinent part, that

> The term "fair market value" is defined ... as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for that asset. This proposed definition essentially reflects the well-established meaning of this term in the area of asset valuation.

vant, and I apologize for having to repeat and thus emphasize it in this fashion. Zealous advocacy is bounded by civility. Lawyers should know where to draw the line, and in my opinion, defendants' counsel have thundered far across it here. Such conduct is arguably inappropriate and certainly unhelpful.

\* Editor's Note: Attachments deleted for publication purposes.

**2.** Federal Rule of Civil Procedure 53, which governs my appointment, was substantially revised between the time of the Order of Reference and the date of this Report, *see* 215 F.R.D. 158 (eff.Dec. 1, 2003). I have reviewed the revised Rule and have found that it requires no material modification of my duties.

DOL Prop. Regs., 53 Fed.Reg. at 17,634 (citations omitted). The proposed regulations require assessment of all relevant factors, including

(A) The nature of the business and the history of the enterprise from its inception;

(B) The economic outlook in general, and the condition and outlook of the specific industry in particular;

(C) The book value of the securities and the financial condition of the business;

(D) The earning capacity of the company;

(E) The dividend-paying capacity of the company;

(F) Whether or not the enterprise has goodwill or other intangible value;

(G) The market price of securities of corporations engaged in the same or a similar line of business, which are actively traded in a free and open market . . .;

(H) The marketability, or lack thereof, of the securities . . .;

(I) Whether or not the seller would be able to obtain a control premium from an unrelated third party with regard to the block of securities being valued . . . .

*Id.* at § 2510.3–18(b)(4), 53 Fed.Reg. at 17,638. The proposed regulations note that this list is similar to, and is modeled on, that promulgated by the Internal Revenue Service for valuation of a business for federal income tax purposes in Rev. Rul 59–60, 1959–1 C.B. 237. "Factors (H) and (I) are additional factors specific to ESOP valuations." Shannon P. Pratt, et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies 703 (4th ed.2000).

In applying these factors (and all other relevant factors), there are three generally accepted methods or approaches: the income approach, the market approach, and the asset approach. *See* Pratt et al., *supra,* at 45; Lewis D. Solomon and Lew-

is J. Saret, Valuation of Closely Held Businesses: Legal and Tax Aspects 10–12 (1998); Stephen J. Leacock, *The Anatomy of Valuing Stock in Closely Held Corporations,* 2001 Colum. Bus. Rev. 161, 185; American Society of Appraisers, Business Valuation Standards BVS–III (Asset–Based Approach), BVS–IV (Income Approach) and BVS–V (Market Approach) (www.bvappraisers.org/standards/bvstandards.pdf, latest rev. Aug. 2002). The income approach determines value by estimating the future economic benefits accruing to the business owner, and discounting those benefits back to an equivalent present value by using a discount rate which factors in both the time value of money and the riskiness of the business. The market approach determines value by looking at the price set in a fair, efficient and fully-informed market, if not for shares in the business to be valued, in shares of comparable companies. The asset approach determines value based on the total of the fair market value of the net assets owned by the business. *See* Pratt et al., *supra,* at 46–47. The same three methods generally apply to valuations in ESOP cases, except that "the asset-based approach is used less often than the other two approaches (and mainly for holding or investment companies)." *Id.* at 704.

In determining "adequate consideration," it is appropriate to rely on the opinions of valuation experts in the case, and to adjust them for recognized errors, rather than to undertake to determine valuation *de novo. Montgomery v. Aetna Plywood,* 39 F.Supp.2d at 938. And "[w]hile expert opinions can assist the Court in evaluating a claim, we are not bound by the opinion of any expert witness and may reach a decision based on our own analysis of all the evidence in the record." *Eyler v. Comm'r,* T.C. Mem.

1995–123, 69 T.C.M. (CCH) 2200 (U.S.Tax Ct.1995), *aff'd* 88 F.3d 445 (7th Cir.1996). The Amended Order in this case, quoted at the outset, directs me to review the testimony of the four experts in the case in order to find the value of the USCC stock. I will review the experts' work subject to my own analysis based on these principles of valuation.

### B. Evaluation of the four experts

There were four experts identified by the Amended Order who prepared reports and testified in this case: Steven D. Kerrick of Carpenter & Mountjoy PSC (now Carpenter Mountjoy & Bressler PSC), Jeffrey M. Risius of Stout Risius Ross, Inc., James A. Gravitt of Crowe, Chizek and Company LLP, and Cate Elsten of PricewaterhouseCoopers.[3]

### 1. Steven D. Kerrick

### a. Background

The Kerrick Report (Ex. 30) [4] states the total value of the USCC common stock as of November 30, 1993 to be $53.69 million. The actual opinion gives the value on a per-share basis, but Schedule XXI, p. 213, lists the total value. This report is updated by a letter of March 15, 1994 (Ex. 32), which slightly lowers the value (based on a cash distribution to owners) to $52.15 million, and brings the date of the valuation up to the date of that letter.

### b. Valuation methods chosen

The Kerrick Report lists four general methods of valuation, which conform to the three general principles discussed in Part (A) above, and adds a fourth—the Cost Method, being "the cost to replace the

property," Kerrick Report, p. 168. Although the report was criticized on this basis, *see* Risius Report (Ex. 49), p. 13, this is not a serious shortcoming. Perhaps the intellectual underpinning of the methods was not perfect, but Rev. Rul. 59–60 and the DOL Prop. Regs. exhort evaluators to consider "all relevant factors," and often many others are suggested. *See, e.g.*, Gerald Solk & Richard Grant, *Valuation Techniques for the Closely-held Enterprise,* 92 Comm. L.J. 264–72 (1987).

Schedule XXI of the Kerrick Report, p. 213, is a reconciliation of eleven specific valuation calculations, each a combination of some part of these four general approaches. These variations and the schedules accompanying them appear in the Kerrick Report because the report and schedules were prepared using software which, although Mr. Kerrick testified was "state-of-the-art" at the time, apparently rather mechanically forces the evaluator through the entire menu of valuation calculations. Tr. 7/18/01 50:20—51:11 and 56:21–25.[5] Of these eleven calculations, Mr. Kerrick assigned little or no weight to all but three. I will focus on these three below, but I note that the assignment of immaterial (but non-zero) weights to four other factors which should clearly be deemed irrelevant (book value, liquidation value, adjusted book value, and cost-to-create), remains in my opinion *qualitatively* material, because it calls into question Mr. Kerrick's method in the valuation process. Mr. Kerrick's testimony on this weighting process is conclusory. For one, he testified that "we assigned some weight to that" (Tr. 7/18/01 54:3), for another, "we placed most of our emphasis on going for-

---

**3.** Although the opinions given are apparently those of their respective firms, the Court's order refers to the testimony of each expert by name, and I will do so here, referring to each report as the "[Expert's name] Report."

**4.** "Ex." standing alone refers to the trial exhibits. Otherwise, it refers to the exhibit of the report referenced.

**5.** "Tr." refers to the transcript of trial on the date indicated.

ward and the fact that there are going to be significant changes taking place for this company" (id. 54:14–16), and for still another, "we felt that that would be more indicative of the appropriate way to value the income" (id. 55:20–22). In this regard, the criticism in the Risius Report, p. 18, is credible: "in each instance, [the Kerrick Report] never explained why a specific valuation method was chosen to value the company" and "does not disclose the logic behind the weighting scheme."

The three valuation methods which collectively account for 95% of the Kerrick Report's value of USCC were the "capitalization of earnings" method, the "capitalized excess earnings" method, and the "discounted future earnings" method. All three are different applications of the income approach described in Part (A) above, which places value on a business because of its ability to generate future economic benefits, which are estimated and then discounted back to a present value. I will discuss the issues raised in application of each of these methods, in the order presented in the Kerrick Report.

## c. The "capitalization of earnings" method

First applied in the Kerrick Report is the "capitalization of earnings" method. This method is described in the report (Kerrick Report, p. 169) as one which takes a weighted average of past years' income, weighting the most recent years more heavily, and then assigns a "capitalization rate" which essentially converts that income stream into a perpetuity. As applied in Kerrick Report Sch. VIII, p. 190, the weighted average of USCC's past five years' income was calculated to be $4.43 million. The report then assumed (as calculated without explanation on Sch. VI, p. 188), a capitalization rate of 11%, resulting in a value of $4.43 million / 0.11 or about $40.6 million, as calculated in Sch. VIII, p.190. I find three major problems with

this method, each of which independently makes its use inappropriate here.

### (i) Improper calculation of 1993 net income

First and most importantly, the Kerrick Report's calculation of the average past net income is incorrect because the 1993 net income has been inappropriately calculated. This is critical because the 1993 numbers (as further adjusted even higher) were the most heavily weighted in calculating the weighted average net earnings. See Kerrick Report, Sch. VIII, p. 190 (1993 earnings given 5/15 or one-third of the total weight). The Kerrick Report estimated the 1993 earnings, arriving at $2.8 million (Kerrick Report, Sch. III, p. 178) by using the numbers reported on USCC's internal income statement for the ten months ended October 31, 1993, and "extrapolating" them (see Tr. 7/18/01 68:8, Kerrick's characterization) to numbers for the twelve months ended December 31, 1993. Basically, this amounts to taking the ten-month numbers and multiplying them by 12/10, or 1.2, to arrive at twelve-month numbers. This would be an acceptable method of annualization if income and expenses occurred ratably throughout the year. However, USCC's income and expenses were not uniform at all; indeed, substantial expenses were incurred at year-end. The major example is the payment of year-end bonuses to the owners, represented at $1.75 million (Ex. 77, p. 2) in December 1993.

Mr. Kerrick relies, in defense of the $2.8 million number, on a schedule prepared by Mr. Harbin (Ex. 77) which reports that the $488 million can be reconciled (increased) to about $2.9 million by "adding back" to USCC's reported income three groups of items. The first group is payments to the owners that were treated as expenses when they should have been treated as capital items and not expenses (Ex. 77, p.

482, second line entry, first column; Tr. 7/18/01 73:19–21). The second is a group of expenses totaling $420,000 collectively titled "expenses incurred to date." (Ex. 77, p. 482, line entries 3–6, first column). Kerrick testified that these were items "already expensed in the December numbers that were not expensed in the October numbers" (Tr. 7/18/01 73:23–25). Mr. Kerrick's characterization is likely backwards, that is, it makes sense perhaps if these were items already expensed in the *October* numbers that were not expensed in the *December* numbers. His testimony relating to handwritten notes on the next page of the schedule suggests that my reading is correct (see Ex. 77, p.3 and Tr. 7/18/01 74:10–15), but this testimony appears to refer to *additional* items or items. In any event, the explanation is not credible. The third group is of $1.75 million in bonuses paid to the owners which were treated as an expense in calculating the December 1993 numbers (Ex. 77, p. 482, lines 7–9, first column).

The amounts in the first and third groups, assuming they are correctly characterized would be appropriate to add back to the reported net income as was done in the Kerrick Report. However, this reconciliation does not take into account other items that might have been captured by the "annualization" of the ten-month figures which could have affected income the other direction. This sheet appears to be an attempt to justify using the initial October-based estimates rather than a complete reconciliation. There is no reason why the actual numbers should be able to be "reconciled" to a projected amount in any event. This makes no logical sense, and is evidence that the process stopped when it reached a satisfactory answer regardless of its reasonableness. As a final note, even if it were credible to add back these items in this fashion to justify the $2.8 million figure, the Kerrick Report again adds back the full amount of the

bonuses paid to officers in arriving at the $4.79 million ultimately used as the adjusted 1993 annual income (Kerrick Report, Sch. III, p. 180).

### (ii) Lack of justification for discount rate

Second, the 11% rate used to discount the excess earnings was not justified and cannot be assumed to be reasonable. *See* Risius Report, p. 16, which credibly states this fact.

### (iii) Reliance on past earnings inappropriate

Finally, the major flaw with this approach is that using *past* earnings as a measure of *future* value is a faulty assumption when the enterprise is not a stable one. Pratt, *supra*, at 42–43, quoting James C. Bonbright, Valuation of Property 249–50 (1930): "past earnings are therefore beside the point, save as a possible index of future earnings." Mr. Kerrick testified that "we placed most of our emphasis on going forward" (Tr. 7/18/01 54:14–15) and "we placed a great deal of emphasis on the future versus the past" (*id.* 54:19–20). Mr. Kerrick's own testimony thus discounts almost entirely the utility of this process. Because Mr. Kerrick was in fact able to project future earnings for USCC, as he did so for purposes of the "discounted future earnings" methods described in Part (e) below, it was not necessary or helpful to rely on past earnings as a proxy.

### d. The "capitalized excess earnings" method

Next applied in the Kerrick Report is the "capitalized excess earnings" method, which was the most heavily-weighted of the valuation methods used by Kerrick, accounting for one-third of the weighted average value of USCC. Kerrick Report at 213, Sch. XXI. This method is widely known as the "formula" method, and has

its basis in Rev. Rul. 68–609, 1968–2 C.B. 327. Mr. Kerrick so testified (Tr. 4/17/01 91:9—92:19), as did Mr. Risuis (Tr. 4/18/01 48:18—49:1), *see also* Pratt et al., *supra,* at 282. The "formula" approach of Rev. Rul. 68–609 can be summarized as follows. First, the evaluator determines the fair market value of the business' net tangible assets. Then, those assets are multiplied by an estimated "fair" rate of return on those assets. The result, the annual return on the net tangible assets, is subtracted from the business' average net income. The remaining amount is assumed to be a return on intangible assets. This amount is capitalized (multiplied) by estimating a "fair" return on the intangible assets. This total represents the value of the business' intangible assets. It is important to stress that Rev. Rul. 68–609 was originally intended only for this purpose—to place a value on the intangible assets—and even then, "only if there is no better basis therefor available." *Id.* Nonetheless, it has become very common to add a final step not contemplated by Rev. Rul. 68–609: to add the value of the intangible assets to the value of the net tangible assets and thereby compute a value of the business as a whole. Pratt et al., *supra,* at 285. Rev. Rul. 68–609 widely used and widely decried simultaneously. The solution, therefore, is to carefully examine its application in each case. *See id.* at 282. Mr. Kerrick is the only expert who used this method.

The Kerrick Report, Schedule IX, p. 191, is the application of this method to USCC. In addition, Schedule VI, p. 188, explains how the capitalization rates used (here 10% for the return on tangible assets and 16% for the return on intangible assets) were calculated. Schedule IX applies these rates, using USCC's adjusted net income for the five previous years, giving more weight to the more recent years. Schedule IX is a correct mechanical application of the "formula" method, but I find it unreliable for four independent reasons.

### (i) Improper calculation of 1993 net income

First, the same mistakes made in estimating the 1993 "annualized" income which were discussed in part (c)(i), *supra* pp. 8–10, were repeated here.

### (ii) Improper valuation of net tangible assets

Second the method was applied incorrectly to determine the return on net tangible assets. Kerrick assumed a return on net tangible assets of 10% which, when subtracted from average net income, yields "excess earnings." (Kerrick Report, Sch. IX, lines 1–3). However, the base used was not the fair market value of the tangible assets, but their book value. Since USCC's assets had appreciated substantially beyond their book value even by the Kerrick Report's own analysis (see Kerrick Report, Sch. VII, reporting a "market value adjustment" of nearly one and one-half times book value), it was unrealistic to use book value. The resulting calculation of return on fixed assets was improperly low, and therefore the amount of excess earnings was improperly high, which would result in an unrealistically high value for the business. It is recognized as proper to use fair market values of tangible assets in the "formula" method; book value is used only when it is not practical to obtain fair market values. Pratt, *supra,* at 286–87 (citing IRS Priv. Ltr. Rul. 79–05013 (Oct. 24, 1979)). Since fair market values were obtained here, they should have been used. *Cf.* Risuis Report, App. O, p. 2, item 9. When confronted at with this anomaly, Mr. Kerrick disclaimed the need to use fair market values, *see* Tr. 4/17/01 94:6—97:14. I do not find his explanation credible, as it is inconsistent with the stated IRS requirements, and it disclaims his firm's own written report.

### (iii) Improper calculation of capitalization rate

Third, the excess earnings capitalization rate of 16% is improperly low. According to the Kerrick Report's calculations (Kerrick Report, Sch. VI, p. 188), this rate was obtained in part by taking the assumed proper discount rate for future earnings of 20% and reducing that rate by a 9% "growth rate" (it was in turn, increased by an "excess earnings premium" of 5%, but that is not the issue here). Including a growth rate in the discount of future earnings effectively reduces the discount rate, that is, increases the present value of future earnings, if those earnings are presumed to be growing steadily. However, nearly all parties agreed this was not the case with USCC. According to all experts' projections, USCC's earnings would grow sharply for two years and then level off. See Risius Report, p. 47 (graphically comparing estimates). Thus, the Kerrick Report's assumption of a steady-state growth rate of 9% is not credible. *See generally* Solomon & Saret, *supra,* at 43 ("Generally, most professionals do not hold a high regard for the excess earnings approach because the method relies on rates of return that are largely unsupported by independent studies.").

### (iv) Reliance on past earnings inappropriate

Finally, Rev. Rul. 68–609 itself cautions, as do all analysts, that the "formula" method is not to be used if there are better methods available. Rev. Rul. 68–609, Pratt et al., *supra,* at 301, Solomon & Saret, *supra,* at 43. Here, there are clearly better methods available—the discounted future income methods. As discussed above in Part (c)(iii), *supra,* p. 10, it is erroneous to rely on projected past earnings as an estimate of future earnings if there is reliable information available to estimate future earnings directly. There was such information available for USCC;

in fact both Kerrick and Risius did estimate future earnings. Thus I conclude that the "formula method" should not have been used.

I consider Kerrick's testimony credible when he observes that the method is commonly used, although his assessment depreciates from calling it "the most widely used valuation technique" (Kerrick Report p. 170), to noting that "it was very common" to use it (Tr. 7/18/01 89:25), to finally stating he has used it "often" (*id.* 90:2). However, equally credible and more persuasive is the observation of Pratt et al. that this method

> is one of the most widely used (and sometimes misused) methods of business valuation—particularly with regard for valuations performed for taxation and litigation purposes. This is because analysts often ... apply the mechanics of this "formula method" without considering the sophisticated nuances of this conceptually elegant methodology.

Pratt et al., *supra,* at 302; *see also* Risius Report, p. 14. I conclude that this was the result with the Kerrick Report's evaluation, and the "Capitalization of Excess Earnings" method should be entitled to no weight.

### e. The "discounted future earnings" method

The final method to be discussed from the Kerrick Report is the "discounted future earnings" method. This is described in the report (Kerrick Report p. 170) as one which predicts future earnings over a specified period, and then determines the "residual value" of the business at the end of this period. All these projected values are then converted into present values by applying a discount rate. The Kerrick Report presented two variations on this method, differing only in the projected residual value. The first of these methods,

the "income residual method," determines the residual value by capitalizing the income of the final period. The second method, the "net asset residual method," determines the residual value as the net asset value of the business at the end of the projection period. The two valuations, presented in Sch. XVI of the Kerrick Report at pp. 206–207, differed insignificantly from each other and collectively accounted for about 53% of the weight given all the valuation methods.

Valuing a business by discounting its future expected economic income is the "most commonly accepted method" of valuation, indeed, "[i]t is the very heart of valuation." Pratt et al., *supra,* at 152. Although this is the most proper theoretical approach to use, the Kerrick Report misapplies this approach in several ways. I discuss below the problems common to both variations, and then the problems that are unique to the second approach used.

### (i) Failure to subtract value of debt

The major failing of the Kerrick Report is its failure to subtract from the calculated value for USCC the outstanding debt owed by the company. This is important because the discounted future earnings method, when applied (as all the experts did here) without accounting for interest as an expense in computing earnings, yields a value for the company that belongs to *all* invested capital, both debt and equity, known as "market value of invested capital" or MVIC. The next step required is unambiguous: "The market value of debt, as of the valuation date, is then subtracted from the MVIC to arrive at the market value of equity." Pratt et al., *supra,* at 191. It is clear that neither of Kerrick's discounted future income calculations make this last adjustment, *see* Kerrick Report, Sch. XVI, pp. 206–207. Both the Risius Report (Ex. K, p. 2, line 34) and

the Gravitt Report (Ex. 7, third column) made this important adjustment.

The magnitude of this error makes it, in my opinion, the single most important issue discussed in this Report. The market value of USCC's (that is, its face or book value) as of December 31, 1993, according to the company's audited financial statements, was approximately $18.67 million. *See* Risius Report, Addendum No. 6, p. 839 (USCC financial statements, Dec. 31, 1993: calculated taking current and long-term debt less accounts payable, unearned income, and accrued expenses, which are not interest bearing debt), *accord* Risius Report (Ex. K, p. 2, line 34) ($18,673,916), and Gravitt Report (Ex. 7, third column) ($18,-674,000).

Mr. Kerrick testified twice that he did not believe it was appropriate to subtract the value of the debt in using the "income residual method" (the first of the two discounted future earnings methods). He stated that "it was not considered necessary" because "it was an income approach" (Tr. 4/17/01 111:3–6, questioning by plaintiffs' counsel), and later stated that the debt is not taken into account "because first it is a net income approach, which doesn't take into account the debt, strictly based on the operations of the—of the entity on the income side, and that is not reflected on the income" and he concurred with counsel's statement that this is "consistent with the appropriate methodologies in ESOP valuations" (Tr. 7/18/01 104:4–10, questioning by defendants' counsel). Mr. Kerrick's statements might have been true if the projected earnings used were those available only to the equity holders, but by including no interest expense in his projections, his resulting calculations were the total value of all invested capital, both debt and equity, and it is clear that the value of the debt must be subtracted from this number to arrive at the value of the equi-

ty. Pratt, et al., *supra,* at 191. His testimony on this point is not credible.

Mr. Kerrick also testified twice that he did not believe it was appropriate to subtract the value of the debt in using the "net asset residual method" (the second of the two discounted future earnings methods). See Tr. 4/17/01 111:15–17, Tr. 7/18/01 102:24—103:18. In essence, he claims that debt is taken into account in this method because the residual value, that is after the periods in which income is projected, was calculated using the adjusted net book value of the assets, "which is reflective of the assets less the liability. So yes, we took the debt into account for that approach." Tr. 7/18/01 103:16–18. Mr. Kerrick refers in his testimony, *id.* at 103:8–16, to the number presented in his projected balance sheet for "total equity" of $66 million as of Dec. 31, 1998 (his testimony states the amount as $56 million, but the reference is clearly to the $66 million). This is the number that he claims subtracts the value of debt. *Id.* It does, indeed, subtract the forecasted value of debt in his projected balance sheet for that date five years into the forecasting period. That is, however, irrelevant for two reasons. First, it is a value of debt five years into the future, whereas the only correct number to use is the present value of the debt. But that is trivial in light of the second reason: there is no inkling that this is in any way a valid number. The Kerrick Report and Mr. Kerrick's testimony focus on the preparation and assumptions underlying the projected *income statements,* Kerrick Report, Sch. XIV, pp. 201–202, but never discuss how the projected *balance sheets,* from which this $66 million figure emanates, were prepared. A quick glance reveals unanswered and fundamental questions. For example, in the projections for 1995, Kerrick Report, Sch. XIV, p. 203, col. 3, there appears some $13 million of additional long-term debt. This amount, never mentioned any-

where, also happens during the same year when there is substantial projected net income, but yet total projected net equity declines by over $9 million. Did they assume that USCC borrowed this money and then paid it out as a dividend? That hardly seems likely, prudent, or a use which any lender would permit. There also appears throughout (including the "base" 1993 balance sheet year) preferred stock of $83,000, a trivial amount to be sure, but troubling by its total falsity. Overall, I find the $66 million figure relied upon by Mr. Kerrick, and the implicit $20 million of debt it represents as of Dec. 31, 1998, to be both not credible and irrelevant for the purpose to which the figure was put.

### (ii) Lack of justification of projected earnings

The Kerrick Report does not disclose the basis of its projections for revenues and expenses, which were identical under both discounted future earnings methods used. Only the adjustments for the first year are shown in Kerrick Report Sch. XII, p. 198, where it is noted that 1993 revenues were increased 62.34% to arrive at 1994 revenues (confirmed in Sch. XIV, line 1, columns 1–2 thus: $13,753 \times 1.16234 = 22,327$), and 1993 operating expenses were 41.32% of sales in 1993, though the percentage used in 1994 was 59.6% (*see* Sch. XIV, col. 2, lines 1 and 4), and was approximately 62% each year thereafter. When questioned directly about where these projections came from, Mr. Kerrick testified that "based on the understanding and the contracts they [USCC] had in place, proposals outstanding, that these numbers appeared to be reasonable." Tr. 4/17/01 108:19–21. The Kerrick Report at p. 170 concedes that in using the discounted future earnings approach "a great deal of analysis is usually required to determine the projected economic income of the busi-

ness." I find no such analysis in this record.

### (iii) Additional problems in the "net asset residual" method

The second alternative method, or the "net asset residual method," includes three additional errors. First, using net asset value as a measure of the residual cash flow assumes essentially that the business will operate in its usual way for the projection period (here, five years) and then liquidate. USCC was not going to liquidate in five years. The valuation assumption, therefore, is not realistic. Second, it is inconsistent with the other methods in the Kerrick Report, which focus on future earnings as a measure of value. *See, e.g.,* Kerrick Report p. 171 ("We have placed more emphasis on the excess earnings, the earnings capacity of [USCC], and the cash generated and available to the stockholders rather than the adjusted book value"). Indeed, the projected residual value based on net assets of $26.5 million (Kerrick Report, Sch. XIV, p. 207) is nearly equal to the projected residual value based on net income of $26.9 million (*id.*, p. 206). This contradicts the assumption that was underlying use of the "capitalized excess earnings" method discussed in part (d) above, namely, that USCC has "value in excess of book value" (Kerrick Report, p. 166). Did that value suddenly disappear in 1998 under this method, and if so why? Finally, even if the approach were theoretically consistent and realistic on the facts of the USCC business plan, it does not

account for any income taxes which would be owed upon sale of these assets, and they would be substantial, because everyone recognized that the net assets had even by 1993 appreciated substantially above their cost, and there might be depreciation recapture or other items as well.

### f. Conclusion

The Kerrick Report relied principally on three valuation calculations. The two methods based on capitalization of past earnings were not appropriately used in this case, because projected future earnings *were* calculated, and therefore past numbers were a poor substitute. But the methods based on projected future earnings fare no better. The projections rest on unstated assumptions, the "net asset residual" method is not theoretically appropriate in this model, and most importantly, the outstanding debt owed by USCC on the valuation date is not taken into account at all. For these reasons, I find none of the valuation methods used in the Kerrick Report to be properly applied, and therefore the Report's conclusions regarding the value of USCC to be not credible.[6]

### 2. Jeffrey M. Risius

### a. Background

The Risius Report (Ex. 49) states the total value of the USCC common stock as of March 15, 1994 to be $31.21 million. See Risius Report, Ex. K, p. 2, line 35

---

**6.** The defendants suggest (Def.Reply, p. 13, n. 5) that I have an "obvious lack of regard for [Mr. Kerrick's] expertise." I have reviewed above each of the Kerrick Report's valuation methodologies, assumptions, data analysis, and financial statement adjustments, and all of Mr. Kerrick's testimony, all as set forth in the preceding pages. I have summarized each of the Report's arguments and responded to each one carefully. Although I conclude that the Report contains significant

flaws, critical analysis of the Report's credibility was, after all, my assignment. I have been careful to note the places where the Report does conform to applicable valuation theories and standards. Mr. Kerrick's competence and reputation are not in any way thereby put in question, nor are they at issue here, and any suggestion to the contrary implied by the defendants' remark above is unwarranted.

("Marketable, Controlling–Interest Value of Equity"). This figure contrasts with the $52.15 million amount the Kerrick Report assigns to the same interest.

### b. Valuation methods chosen

The Risius Report lists the valuation factors from Rev. Rul. 59–60 (Risius Report, pp. 25–26). It does not incorporate the additional factors from the DOL Prop. Reg., *see supra* p. 4 (marketability discount and control premium), but the report does later discuss these factors. See Risius Report, pp. 61 (marketability discount) and 68 (control premium). The report lists the three types of valuation consistent with Part I(A), *supra*, pp. 4–5. The discounted cash flow method and the guideline company method (discussed in Part 3(c), *infra*, p. 35) were applied. Risius Report pp. 31–37. In the end, however, the guideline company method was discarded, *id.* at 69. I will discuss in detail, therefore, only the discounted cash flow method.

### c. Discounted cash flow method

This method of valuation is theoretically identical to the "discounted future earnings" method described above in the Kerrick Report. *See supra* Part (1)(e), p.14. It is an analytically sound method of valuation. The Risius Report suffers from none of the drawbacks in application of the method identified in the Kerrick Report. I discuss below the four major differences between the two reports.

#### (i) Projections of cash flows

The Risius Report goes to great length to substantiate the projected revenues for each of USCC's operating facilities and the projected overall operating expenses. Risius Report, pp. 38–55, and Exs. G, H and I. In each case, the report compares the projections with those of the Kerrick Report and another set of projections made by the Bank of Louisville in evaluating USCC's creditworthiness. *See id.* at pp. 47 (total revenues) and 54–55 (revenues less operating expenses). In each instance, the report projects significantly lower numbers than does the Kerrick Report; however, there is substantial justification for the numbers given in the Risius Report, whereas the Kerrick Report relies on unstated assumptions and projections, *see* Part (1)(e)(ii), *supra*, pp. 17–18.

#### (ii) Discount rates

The Risius Report discounts the future cash flows at a 17.5% rate, calculated according to the "Weighted Average Cost of Capital" (WACC) approach. The WACC approach is specifically identified by Pratt, et al., *supra*, at 190–91, as the appropriate discount rate calculation method where the market value of invested capital is the figure to be estimated. *Accord* Samuel C. Thompson, Jr., *A Lawyer's Guide to Modern Valuation Techniques in Mergers and Acquisitions*, 21 J. Corp. L. 457, 524–25(1996) (use of WACC is appropriate where calculating the value of the firm as a whole); Jay W. Eisenhofer & John L. Reed, *Valuation Litigation*, 22 Del. J. Corp. L. 37, 114–15 (1997) (describing the WACC approach and its acceptance by the courts). The WACC, as its name implies, uses two discount rates, one for debt and one for equity, and weights each according to the entity's capital structure. *See* Pratt et al., *supra*, at 190–91. The application of this method in the Risius Report is credible.

The equity discount rate was determined to be 25.6% using market estimates, *see* Risius Report p. 59. Mr. Risius was pressed to defend this rate at trial when it was challenged as too high. "[I]f you are talking about a startup company that's a venture capital firm, those kind of rates of return, you know, might be 50 to 70 percent, depending on the phase of the project. So relative to that, no, it's not a high

rate of return." Tr. 4/18/01 159:3–7. "Relative to CCA [a much larger company which was a competitor of USCC], I think my opinion is that USCC would be a more risky endeavor than [CCA]." *Id.* 161:10–12. He acknowledged that there were factors working to diminish risk, namely, that the company had government contracts with low risk of default and that the private corrections industry was growing rapidly, *see id.* 161:13—162:3. And he concurred in the characterization that the 25.6% figure was ultimately determined "exercis[ing] your qualitative interpretation." *Id.* at 162:4–5 (question by defendants' counsel). This is all consistent with the text of the Risius Report, identifying components of the discount rate being the risk-free return rate, additional amounts reflecting industry risk, company size, and risks specific to the company being evaluated. Risius Report, p. 59. This, in turn, is consistent with the proper calculation of the discount rate. *See* Pratt et al., *supra,* at 160–61. In particular, Pratt notes that the last component—company-specific risk—"is often a matter for the analyst's professional judgment." *Id.* at 181. (The Risius Report at p. 59 notes specific factors which were part of that judgment: "aggressive growth projections, formidable competitors, etc."). I find the Risius calculations credible and in line with proper valuation standards.

The Gravitt Report (Ex. 74) at p. 9, ¶ 6, criticizes the Risius Report on many of these same grounds. It alleges that the Risius Report "provides no detail regarding the development of its discount rate" and that the "assessment seems to ignore the [firm] contractual nature of ·USCC's projected revenues." The first allegation is refuted by the Risius Report analysis at p. 59, discussed above. The second allegation was refuted by Mr. Risius' testimony at trial, cited above, where he acknowledged there were factors that did in fact decrease the risk of USCC's revenues.

The Gravitt Report's conclusion, p. 9, ¶ 6, that "a business valuation expert could reasonably conclude that a lower discount rate would be more appropriate" may be true, but it is wide of the mark. A different expert could also reasonably conclude that a higher rate would be more appropriate. There is no basis to conclude that the Risius Report does not take into account all the appropriate factors in calculating its discount rate.

Mr. Risuis was asked at trial to compare his 25.6% figure with the 20% used by the Kerrick Report as a return on equity. Contrary to Mr. Risius' testimony that "it's impossible to tell [what the Kerrick Report rate is]," Tr. 4/18 160:10, I find it credible that the Kerrick Report's 20% rate was intended to be a return on equity rate. However, I find the Risius Report's justification for its 25.6% rate more credible than the Kerrick Report's justification its the the 20% rate. The Risius Report describes its calculations as follows:

To estimate the equity component of this weighted average rate of return, we added an equity risk premium to the risk-free rate of return (represented by U.S. Treasury Bonds) as of the Valuation Date. The equity risk premium is based primarily on historical return data from the Center for Research in Securities Prices (CRSP) at the University of Chicago. An article published by Roger Grabowski and David King in *Business Valuation Review* details the returns for companies traded on the New York Stock Exchange from 1963 to 1993. The universe of companies included in this study and the related returns were segregated into 25 groupings based on the size of each company. Based on this study, the relative size of the Company, and other specific company risk factors (i.e. aggressive growth projections, formidable competitors, etc.), we estimate a

required rate of return on equity capital of 25.6%

Risius Report, p. 59. Mr. Risius offered further detail in his testimony, Tr. 4/18/01 88:2—90:4.

In contrast, the Kerrick Report offers the following calculation of its return:

| | |
|---|---|
| Real Return & Inflation | 6.0% |
| Quantitative Risk Premium | 4.0% |
| Management Continuity | 10.0% |
| Discount on Future Earnings | 20.0% |

Kerrick Report, Sch. VI, p. 188. This presentation does show the value assigned to each constituent component of the discount rate, whereas the Risius Report does not, and reports only the total. However, detail does not make precision, nor does it substantiate numbers. Mr. Kerrick's testimony offers only the most general description of where the numbers came from.

> Well, based on again our discussions with management on what the industry outlook was, what their specific outlook was, growth prospects for them. And again looking at other materials that we were trying to obtain and did obtain and look at for just trying to understand the industry and where it was going.

Tr. 7/18/01 96:10–15. The contrast between the research-based conclusions of the Risius Report and the vagueness of the Kerrick Report is clear. I find the Risius Report's 25.6% return rate for equity to be credible, or at the very least, its credibility is not diminished by the 20% number from the Kerrick Report, and I have no basis upon which to select a different number.

Defendants make much more of this discrepancy in their Reply, however, see Def. Reply pp. 31–35,[7] suggesting that I do not deem it important, so further elaboration and reply is perhaps in order. Defendants suggest that the Risius Report's 25.6% figure is a "mystery" valuation variable, whose use is eschewed by Pratt et al., *supra* at 462 ("Guideline 1" in "Suggestions for Effective Report Writing"), *see* Def. Reply, p. 31, citing the above passage. This portion of Pratt's treatise is addressing (as the caption indicates) stylistic issues. The Guideline 1 says in its contextual entirely that the analyst should not use broad statements, such as " 'companies in this industry tend to sell at six to nine times EBITDA' " without citing specific evidence. Pratt et al., *supra*, at 462. I do not believe the 25.6% figure is mysterious in that fashion. I note that the very next Guideline # 2 states that "the source of significant data elements" (e.g., inflation rates, risk-free rate of return, capital market performance indices) should be referenced and documented in the valuation opinion report. *Id.* at 463. This, in my opinion, is a criticism which squarely applies not to the Risius Report, but to the Kerrick Report. In sum, I have on one hand (as discussed above) the Kerrick Report's detail without substantiation nor authority, and the Risius Report's citation of authority without complete detail. Neither is perfect, but the Kerrick Report figures remain entirely unsupported and, in my opinion, less credible.

There is generally accepted guidance in calculating the equity rate. Most experts agree this rate should be calculated as the sum of four parts: a "risk-free" return (including inflation), a premium reflecting the general risk of investment securities which any investor bears, a "size premium" reflecting the typically larger risk attendant to smaller companies, and a further adjustment reflecting "investment-specific" risk. *See* Pratt et al., *supra*, at 159–81, Solomon & Saret, *supra*, at 51.

---

7. This and the following four paragraphs were added in response to suggestions made by defendants on the Draft Report.

With this guidance, I examine each expert's calculations.

It is possible, for example, that the Kerrick Report, Sch. VI, p. 188, quoted *supra*, assigns 8% to the first factor, 4% to the second, and 10% to the fourth. The captions used in the Kerrrick Report make further certainty impossible. The four percent assigned to market risk seems unduly small, as basic market-risk premia have been fairly steady at around 8–9%, *see* Pratt et al., *supra* at 178 (Ex. 9–10, "Risk Premia"); Richard A. Brealey and Stewart C. Myers, Principles of Corporate Finance 131 (4th ed. 1991) (Table 7–1, identifying average risk premium over the 1926–88 period to be 8.4%). It could be that the Kerrick Report decided that the corrections industry was less risky than most market investments; the Defendants' Reply suggests that is the case also, Def. Reply p. 34. Neither advocate has industry data to support this analysis. The Defendants' Reply suggests that USCC would be less risky because its existing contracts were stable. This misses the point. Though USCC's present business may be stable, its prospects for growth were risky. Its projected earnings were in fact volatile, as each expert who estimated those future earnings noted. This is the component of risk captured by this factor. Finally, the ten percent assigned to investment specific risk seems to be an unduly large figure, although it is not unheard of; *see* Def. Reply at 34–35 (quoting a different Pratt treatise). In any event, it is impossible to tell because there is no narrative supplied in the report, and the trial testimony was not illuminating. The 25.6% figure from the Risius Report, though not broken down, is accompanied by a description of its factors, as indicated in the excerpt quoted above. It is better than the Kerrick Report because the figure and the supporting narrative can be used—Def. Reply, pp. 34–35 is a perfect example—to estimate the component parts, as they have done. My estimates of the Kerrick Report components, above, are only guesses and there is no further information and, importantly, no empirical source cited. The defendants make much of the apparently large adjustment the Risius Report has made for "investment-specific" risk, Def. Reply pp. 34–35. It is clear that this is a matter for the analyst's judgment, because there will be no data (by definition) available; *see* Pratt et al., *supra*, 163 (Exh. 9–2, fourth row) and 181. Both experts apparently assigned large numbers to this factor, we have no way of knowing in either case. It is equally clear that the judgment must be supported by "a very strong narrative" as defendants put it (Def. Reply p. 35, citing a different Pratt treatise). Neither Report is a model of strong narrative, but, as I concluded *supra* p. 24, the Risius Report has some, the Kerrick Report has virtually none.

Defendants further contend (Def.Reply, pp. 28–31) that the data used in the Risius Report is not appropriate for use here because it was not published until 1997, *see id.* p. 28. However, defendants' criticism is incorrect. There is a difference in using post-valuation-date data and using post-valuation-date analysis of data in existence at the valuation date. The former is using the future to make past predictions of it more accurate, as if the weather forecast from yesterday were modified today to take into account the actual results. This would be inappropriate. However, the Risius Report relies on analyses of data from the 1963–1993 period, which lies entirely before the March 15, 1994 valuation date. This is entirely appropriate. That it was only published later is not important, likewise unimportant is the fact that the Kerrick Report, prepared at an earlier date, could not have used it. The use of this data does not, as defendants charge, "second-guess the 1994 judgment of Mr. Kerrick with information which was not even

in existence at the time" (Def.Reply, p. 28), but rather simply uses later analyses of proper period data. If someone presented me today with stunning and convincing new analyses of pre-valuation-date data, I would welcome its use (as, I think, should the defendants). Determining the value of the USCC stock is my charge in this Report.[8]

The Risius Report determines a cost of debt at 4.6%, which is undisputed by any of the parties. It then calculates a weighted-average of these two rates, weighting the equity rate at 60% and the debt rate at 40%. Mr. Risius justified this 60:40 ratio at trial by noting that it was higher than a competitor's 25:75 ratio, and that this competitor had much less debt than USCC. Tr. 4/18/01 at 169:4–12. His justification is not convincing, as it does not specify how we get from the competitor's ratio to that used in his USCC calculations. The Gravitt Report, pp. 9–10, ¶ 7, concludes, I believe credibly, that the Risius Report "is unclear exactly what basis [it] has used for projecting [its] hypothetical capital structure."

However, I find this to be an oversight without impact. The 60:40 ratio used by the Risius Report seems justified by USCC's actual ratio of the market values of both amounts at the valuation date, which is the proper method of calculating WACC. See Pratt et al., *supra*, at 191, Ex. 9–14D. Although there is scant discussion of the actual fair market value of USCC at the valuation date in the Risius Report, the Kerrick Report made such an estimate, see Kerrick Report, Sch. VII, p. 189, and USCC's debt:equity ratio can be calculated from it. The Kerrick Report lists

USCC's adjusted book value—adjusted primarily to reflect the fair market value of the assets, see *id.* at 165—at just over $51 million, its total equity value at $34 million, and a total debt value of approximately $17 million, and therefore approximately a 67:33 equity-to-debt ratio, acceptably close to the ratio actually used in the Risius Report.

The Risius Report made one further adjustment to the discount rate not made in the Kerrick Report, and that was to adjust the discount rate used to value the residual amount, or the cash flows in perpetuity, to allow a growth factor. The theoretical justification is that even at the "steady state" assumed in calculating the residual period, "the economic income will grow at some constant compound rate in perpetuity." Pratt, et al., *supra*, at 217. This is noted by Pratt et al. as "[o]ne of the most common ways to estimate the terminal value." *Id.*

In response to counsel's challenge that he did not "recognize [USCC's] substantial growth opportunities," Tr. 4/18/01 155:1–2, Mr. Risius testified that the growth potential was recognized in the actual revenue projections, particularly in the first two years. *Id.* at 155:3–11; Risius Report, p. 47. The Gravitt Report's criticism that the Risius Report "fail[s] to incorporate the 'substantial growth opportunities' in its valuation," Gravitt Report, pp. 8–9, ¶ 3, is incorrect in light of Mr. Risius' testimony.

Both the questions at trial and the Gravitt Report misunderstand the nature of the three-percent growth factor. This growth amount is applied at the *end* of the useful

---

8. I note also that it rings hollow for defendants to make the suggestion that information after the valuation date cannot be used, when much ink is spilt in their reply stressing the actual performance of USCC after the valuation date as a measure of its predicted value on the valuation date. *See* Def. Reply, pp. 16–

21. These suggestions are discussed in detail in Part II(D) *infra*. In addition, to go the further step, as defendants do, and suggest that the Risius Report's use of this data was "disingenuous" (*id.* p. 28), a "smoke and mirrors approach" (*id.* p. 30), or "sneak[ing] by us" (p. 31, fn.16) is especially unhelpful.

income-projection period. Here, all analysts used a projection period of five years. No one really dared venture beyond that (the Kerrick Report calculated projections for ten years, *see* Kerrick Report, Sch. XIV, pp. 202 and 204, but did not rely on them). At this point, an analyst simply assumes that the business will continue in its projected state indefinitely. What the 3% growth factor included in the Risius Report does is allow this income to grow in perpetuity, not reflecting growth in business but growth in nominal earnings. Mr. Risius noted at trial that his three percent was pegged to his estimates of the rate of inflation. Tr. 4/18 156:12. This is exactly the purpose of the growth rate applied *after* the projection periods, as clearly distinct from any growth rates applied to estimate cash flows *in* the projection periods. Indeed, the use of this three percent growth rate serves actually to lower the discount rate applied to the residual amount, and therefore works in the defendants' favor, as the Kerrick Report makes no such adjustment. This is perhaps the best evidence that the defendants misunderstand the purpose of this three percent growth factor, and I find their criticisms of it not to be credible.

Defendants at trial and in their Reply have done much in the name of "sensitivity analysis," *see* Def. Reply, pp. 26–27, and trial pages cited therein. It is true that the evaluator's assumptions are just that— assumptions. Their job, and mine upon review of their work, is to be assured that the assumptions are disclosed, substantiated and reasonable. In my opinion, this was done in the Risius Report and at trial, where he maintained, that while judgments may be qualitative and subjective, they are not arbitrary. Tr. 4/18/01 145:1–13. His defense of his work is credible. There is much work done by defendants in this same vein by showing that changing the numbers will change the results. *Id.* 171:19—178:1 and Def. Reply Apps. B and

C. Defendants consistently use lower numbers to produce lower results. But without any justification of the numbers selected, all defendants have shown is, to use an example, that $3 \times 10$ equals 30, but that $2 \times 10$ only equals 20. Mr. Risius testifying at trial concluded:

A. . . . I would bet that the calculation you have here is correct.

Q. All right.

A. But not meaningful.

Q. All right.

Tr. 4/18/01 175:1–5. I concur.

### (iii) Capital expenditures

The Risius Report subtracts from available cash flows $1 million each year (except for $3 million in 1995–1996) to be used for capital investment. *See* Risius Report, Ex. K, p. 1, Line 16. Accounting for capital expenditures is an important adjustment in estimating future cash flows; *see* Pratt et al., *supra,* 158 (requiring subtraction of capital expenses "necessary to support projected business operations"). The use of the larger ($3 million) figure in 1995–1996 is explained in the Risius Report as incorporating $2 million of additional investments already planned at one of USCC's facilities. The "base rate" of $1 million per year is justified by citing an historical rate of net capital expenditures as a percentage of revenue ranging from 20 to 48% and then selecting the $1 million figure because "it is imperative to account for future expected capital expenditures required to sustain USCC's significant anticipated growth." Risius Report, p. 56. The justification has nothing to do with the fact statement; the Risius Report did not derive the $1 million figure in any way as a percentage of revenues, nor describe why it would not grow, nor describe why it was required at all since USCC does not own many of its properties. It is theoretically important to account for capital expendi-

tures, but I find that, apart from the $2 million in 1995, the remainder is not a credible account. I concur with the Gravitt Report, Ex. 11, ¶ 9, that the Risius Report "has no basis for its assumption of capital expenditures."

Plaintiffs in their Reply indicate that USCC does own several properties in need of repair which would require some capital investment; Pl. Reply, pp. 1–2. This observation is credible, but just like the Risius Report, the Plaintiffs' Repoly does not translate this narrative into numbers. It only repeats the Risius Report's suggestion, that "this is a reasonable estimate." *Id.* at 2. Such an estimate, however, remains unreasonable if unsubstantiated. Plaintiffs' further suggest, *id.* at 3, that I select some number between $0 and $1 million as reasonable. This suggestion is one more in the nature of mediation or compromise, and while it may be true that "business appraisal results are often used to stake out negotiating positions," Solk & Grant, *supra* at 257, that is not my purpose here.

In addition, plaintiffs suggest that the residual value should be decreased by allowing a different amount but for a similar reason, Pl. Reply, p.3. They suggest that there is a different rationale underlying this figure, that in the long run depreciation and capital investment could be assumed to be equivalent. *Id.* But again, there is no foundation underlying either the Risius' Report number or plaintiffs' suggestion. While it may be conceptually true that the two figures (depreciation and net capital investment) would be equivalent in the long run, this is assumption and not evidence. There is little discussion of USCC's specific capital asset acquisition or disposition plans in 1998 that might support such an assumption.[9]

### (iv) Payments to Mr. Todd

The Risius Report includes in the amount that must be subtracted from the value of the company to arrive at the value of the equity not only the USCC debt, but also the present value of the payments owed to Mr. Todd under an employment, non-competition and consulting agreement. *See* Risius Report, p. 61 and Exhibit J. The Gravitt Report, Ex. 11 at ¶ 15, questions the use of this reduction because "these payments would not be required unless the ESOP was implemented" and that therefore "they should not be considered in an opinion of the Company's fair market value before the implementation of the ESOP."

There are two different factors at work here. On the one hand, it is clear that valuing a company for "adequate consideration" paid by the ESOP "simply does not mean that it must be valued as if the purchase had closed and the debt were in place." Robert R. Trumble, et al., *ESOP Valuation Techniques,* 5 Valuation Strategies 28 (July/Aug 2002), 2002 WL 1343070; Pratt, et al., *supra,* at 29 ("the concept of fair market value means the price at which a transaction could be expected to take place under *conditions existing at the valuation date* ") (emphasis in original). *See also* Mem. Opinion and Order, *supra,* 215 F.Supp.2d at 891 (directing me to determine the value of the USCC stock *purchased by the ESOP* in March 1994) (my emphasis). On the other hand, the parties structuring a leveraged ESOP should not be able to disguise the cost of the transaction by arbitrarily designating some of the amount paid for the stock as payment for something else, thus reducing at will the cost of the shares purchased by the ESOP. In this case, the purpose of the side pay-

---

9. The preceding two paragraphs were added in response to suggestions made by plaintiffs on the Draft Report.

ments to Mr. Todd was to pay him the total value he desired—$25 million—but not have all of that value assigned to his USCC stock being purchased by the ESOP. *See* Mem. Opinion and Order, 215 F.Supp.2d at 871.

The payment to Todd is not, strictly speaking, "acquisition debt." It was not incurred by the ESOP, but by USCC. Nonetheless, the characterization of the Gravitt report is true: but for the ESOP transaction, USCC would not have incurred the liability. So it is similar to acquisition debt. Yet, to ignore this amount would enable parties to recast the consideration in *any* manner. Suppose Mr. Todd had been paid $1 for his USCC stock by the ESOP and the remainder in a "consulting agreement" by USCC. Clearly, the ESOP would get a bargain at the expense of USCC and its remaining stockholders. This hypothetical helps pinpoint the harm and the remedy. The agreement between Mr. Todd and USCC must be tested for its *bona fides,* but assuming it has that, the decision to pay Mr. Todd a large sum from USCC's treasury, which reduced the amount he would demand for his stock, is a matter for the USCC shareholders, if anyone, to complain about. In any event, I find it proper to exclude the debt to be paid to Mr. Todd from the outstanding debt of USCC on the valuation date, and I find Mr. Gravitt's criticism credible and the Risius Report valuation flawed in this respect. This is not to say that there is no remedy for improper payments in such a case, but the remedy is not to alter the value of USCC as it existed prior to the ESOP transaction.

#### d. Conclusion

I find that the Risius Report is a conceptually complete application of the discounted cash flow method of valuation, which is the most preferred method to be used. The adjustments required to remove the effect of the amounts for assumed annual capital expenditures and the present value of the payments to Mr. Todd do not affect the basic projections and discounting in the report, and I find it otherwise sound and credible.[10]

### 3. James A. Gravitt

The Gravitt Report does not independently calculate a value for the USCC common stock as of March 15, 1994. Rather, it concludes, in relevant part, that the Kerrick Report's valuation result[11] was reasonable and that the Risius Report is not reliable. Each of these aspects is discussed below.

#### a. Reasonableness of the Kerrick Report's result

The Gravitt Report's endorsement of the Kerrick Report's result can be dismissed as not credible from the outset for one compelling reason. The Gravitt Report fails to account for the Kerrick Report's failure to subtract the value of the debt from its total value of USCC. Thus, it takes $52.1 million as the value given by the Kerrick Report for "a 100 percent interest in [USCC]" (Gravitt Report, p. 2). As discussed above, Part 1(e)(i), *supra* pp. 15–17, this is the most significant error in the Kerrick Report. The Gravitt Report recognizes this error, because its own calculations of the value of the USCC stock do, by contrast, subtract the value of the

---

**10.** Def. Reply, pp. 9–10, suggests there may be credibility problems with Mr. Risius. I found that issue raised and adequately refuted by him at trial, *see* Tr. 4/18/01 142:21—144:21, and nothing new was added in the Reply other than unhelpful and unnecessary personal attacks.

**11.** I have added this word in response to the suggestion at Def. Reply, p. 3, n. 1.

debt in arriving at their numbers. *See* Gravitt Report, Ex. 7, col. 3. Therefore, Gravitt should have reduced the Kerrick Report's number to $33.4 million (the reported figure less the $18.7 million of debt). With that adjustment, now "comparing apples to apples," the Gravitt report endorses as reasonable a value of $33.4 million (instead of $52.1 million) by comparing it to a range (discussed below) of between $26.8 and $91.4 million. The endorsement given by the Gravitt Report to the result of the Kerrick Report rings less loudly with this correction.

### b. The guideline company approach

The range calculated by the Gravitt Report was the result of the "guideline company approach," which is a widely-recognized method of valuation. It is an application of the market-based approach, calculating the value of the subject company by using a guideline measure which can be compared with the same guideline measure from similar companies whose shares are publicly traded. We can use this comparison, by means of a multiple converting the guideline measure to the observed price for the publicly-traded companies, to infer a market-derived price for the subject company. It is well regarded by the experts; *see* Pratt, et al., *supra,* at 224 (it "may be the most important and appropriate technique," citation omitted); Solk & Grant, *supra,* at 266 ("Although there are significant difficulties in applying this method, the effort is well worth the appraiser's time."), and is especially relevant where "fair market value" is the valuation standard, as it is here. Pratt et al., *supra,* at 228; Solomon & Saret, *supra,* at 58.

The initial and most difficult step in applying the guideline company approach is to find an appropriate selection of guideline companies. Indeed, both Messrs. Kerrick and Risius considered and rejected this approach for this reason. *See* Kerrick Report at p. 167 ("no corporations were identified that were of sufficient comparability, in our opinion, for inclusion as comparable corporations"); Risius Report at p. 69 (indicating that the guideline company chosen was too dissimilar to USCC to merit any weight in the valuation analysis). Most experts suggest using an exhaustive list of criteria with which to determine comparability, *see* Pratt et al., *supra* at 230–33, Solomon & Saret, *supra,* at 58–60. The Gravitt Report settles on four comparable companies, and while the reasons given for selecting each are brief, *see* Gravitt Report, pp. 4–5, his supporting testimony is valuable in adding credibility; *see* Tr. 10/11/0118:18—29:10.

The measure selected as the "guideline variable" by the Gravitt Report is the ratio of the market value of invested capital (MVIC) to earnings before interest, taxes, depreciation and amortization (EBITDA). By calculating the MVIC based on the public companies' reported stock prices, and the EBITDA for those companies *and* USCC, the report infers a value for USCC's MVIC, or total value of both debt and equity. The use of this MVIC/EBITDA ratio is recognized as superior by experts because it eliminates (insofar as possible) the effect of a company's capital structure (the amount of debt), which will differ widely among otherwise similar companies. *See* Pratt et al., *supra,* at 252; Thompson, *supra,* at 534–37. Indeed, the Gravitt Report selects it for that very reason, *see* Gravitt Report, pp. 5–6.

Mr. Risius offers several criticisms of the Gravitt Report, *see* Affidavit of Jeffrey M. Risius, Oct. 18, 2000 (attached as supplement to Risius Report, hereafter referred to as "Risius Aff."). I find only three which require mention discussion and slight adjustment to the Gravitt Report's conclusions.

First, Mr. Risius observes that the market price of the comparable companies changed drastically from December 31, 1993 to March 15, 1994. During those two and one-half months, the three companies which were publicly traded at that point saw their share prices increase 79%, 60%, and 78% respectively. Although Mr. Risius uses this change as a broad indictment of the Gravitt Report, see Risius Aff. ¶ 7, I note only that the tremendous price increases require consideration of both amounts, and not only of the March 15, 1994 prices, as the Gravitt Report does in its Exhibit 6. The guideline company approach relies on the ability of market prices to reflect market values. Sometimes, as here, that is not necessarily the case.

> Pricing efficiency between the private and public markets is dissimilar. Closely held stocks do not have a market wave to ride. In fact, at least one study showed that, over a ten-year period, multiples for small companies did not appear to be time-sensitive, and that these companies traded in a fairly tight range: . . . . In the public markets, however, market efficiency . . . is under attack. The growth of large trading institutions has created a situation in which investors bet the market, rather than focus on individual stocks.

Robert T. Slee, *Is the Subject Company Similar?*, 1 Valuation Strategies 4 (May/June 1998), 1998 WL 1844949. If the market price is to reflect true value, it is difficult to believe that the value of these companies nearly doubled in such a short period of time, without any other fundamental changes in the companies or the industry, and none have been mentioned by any experts. Therefore, in employing the guideline company approach, I will use both sets of prices to establish a reasonable range.

Second, Mr. Risius takes issue with the Gravitt Report's calculation of USCC's EBITDA for 1993, suggesting that excessive amounts were "added back" to account for additional amounts paid to owners. The Gravitt Report, Sch. 1, lists at the bottom $2.887 million that was added in this fashion, more than doubling the reported amount. There is no explanation given for this amount in the Gravitt Report, only that the addition should be made "to adjust for economic compensation." Gravitt Report, p. 3. Both Messrs. Risius and Gravitt agree that such an adjustment is necessary, but they disagree as to the amount. See Risius Aff., Ex. 2, p. 2 (calculating this same "add back" at an amount approximately $0.5 million less). I find neither amount to be not credible, and the guideline range presented below uses both values.

Finally, Mr. Risius suggests the Gravitt Report improperly included one comparable company, Wackenhut Corporation, because it was not publicly traded (and hence did not have reported stock prices) until August of 1994, well after the valuation date of March 15, 1994. This is true, but I find that the additional information provided does, on balance, provide valuable information that, at least initially, outweighs the impropriety of using post-valuation-date information. To add a fourth company to the sample increases the comfort level an appraiser can have in using the guideline company method, *see* Pratt et al., *supra*, at 233 ("we have used as few as two or three guideline companies . . . . Our confidence rises sharply when we can find four to seven good guideline publicly traded companies."). True, this is not a statistically robust adjustment, but given the utility of the guideline company approach as providing a range of values, I find probative value in using Wackenhut Corporation. However, the use of this data is limited to the company's stock price as reported at its initial public offering in August, 1994. The Gravitt Report also suggests that the price at December 31,

1994 should be used as well, but this—nine months after the valuation date—tips the prejudicial value of using post-valuation data above the probative value of the later (much increased) numbers.[12]

Taking all these factors into consideration, Table 1 below presents the results of the adjusted Gravitt Report guideline company analysis. The first data row presents the MVIC/EBITDA ratios of the four comparable companies based on the December 31, 1993 stock prices, and the resulting MVIC range calculated by applying this ratio to USCC's EBIDTA in the approximately $4—$4.5 million range discussed above. The second row presents the same calculations based on the March 15, 1994 stock prices (except in the case of Wackenhut). The results are culled by using the median, which most experts agree is appropriate due to the wide range of values typically presented in guideline company analysis. *See* Pratt, *supra*, at 243–44. The Gravitt Report uses median numbers as well in its Exhibit 6 and at p. 6.

**TABLE 1**
**ADJUSTED GUIDELINE VALUES FROM GRAVITT REPORT**

| Multiple based on: | Comparable Companies | | | | Median Multiple [2] | Implied value for USCC based on median [3] |
|---|---|---|---|---|---|---|
| | CCA | CSC | Wackenhut [1] | CCS | | |
| 12/31/93 prices | 10.85 | 10.31 | 16.30 | 7.61 | 10.58 | $42.4–$47.9 million |
| 3/15/94 prices | 15.99 | 16.34 | 16.30 | 10.04 | 16.15 | $64.7–$73.2 million |

1. Wacknhut numbers are the same in each case, based on the August IPO price.
2. With an even number of observations, the median is the average of the middle two observations.
3. Using Risius' figure for USCC's EBITDA of $4.008 million for the lower range, and Gravitt's figure for USCC's EBITDA of $4.532 million for the upper range.

The table shows a useful and comfortable range. The range is entirely appropriate in this application of the guideline company approach, for three reasons.

First, although the guideline company approach is useful and its application is always encouraged, everyone recognizes its limits. No company will be entirely comparable to the subject business. *See* Solk & Grant, *supra* at 266 (comparisons "may be hazardous at best"); Pratt et al., *supra*, at 230–33 (summarizing factors and inconsistent results in litigation, making hazardous both too narrow and too broad a selection of comparables). In addition, most guideline company approaches examine several years of data for the guideline companies. See Pratt et al., *supra* at 234 (suggesting five to ten years); Solomon & Saret, *supra*, at 65 (noting that comparable company data must be analyzed for trends). The Gravitt Report, by contrast, presents between one and three years of data for the comparable companies, *see* Gravitt Report Exs. 2–5, and relies only on the most recent year in each case for comparisons to market data, *see id.* Ex. 6. Also important as a limit on the guideline

12. In any event, using a median value for the multiples makes the absolute size of the Wackenhut numbers—already outliers—most- ly irrelevant in the analysis. *See* Gravitt Report, Ex. 6 and *infra* Table 1.

company approach is the suitability of the subject company. The approach loses robustness the further the subject company is away from the attributes of a stable, publicly-traded business. Although USCC was comparable in many ways to the guideline companies, it was more highly leveraged, closely-held, and was not poised to enter the public markets. The Gravitt Report candidly and credibly notes at p. 5 that "USCC appears similar in some ways and differs in some respects when compared to the publicly traded corrections companies." *See* Slee, *supra* ("To have a relevant private-to-public comparison, the subject company should have the attributes necessary to go public itself."). Overall, though, none of these shortcomings justify discarding the guideline company method entirely.

> The method needn't be rejected just because we were not satisfied with either the number or the degree of comparability of available guideline companies. In the final analysis, the quantity and quality of the guideline company data compared with the quantity and quality of data available for other methods will influence the weight accorded the method in correlating the results of various methods and reaching a value conclusion.

Pratt et al., *supra*, at 230.

Second, experts recognize that one important use of this approach is a check on the reasonableness of assumptions in other approaches, most notably the discounted cash flow approach. *See* Solk & Grant, *supra*, at 266 ("Even where the companies are not absolutely comparable, their sales prices can serve as a check on the eventual valuation placed on the business under appraisal."); Pratt et al., *supra*, at 190.

Finally, the use of this method as a range is the consistent intent of the expert who applied it in this case. The Gravitt Report, as stated at the outset, was never intended to place a specific value on the USCC stock, but rather generate a range of reasonableness by which a result could be measured. It fails to do so in regards to the Kerrick Report, as stated in Part (a) *supra*, but the range can nonetheless be profitably applied to confirm the value conclusion to be reached.[13]

### c. Criticisms of the Risius Report

The Gravitt Report lists several "significant material flaws" in the Risius Report which "taken collectively, invalidate its concluded value." Gravitt Report, p. 6. Those criticisms are listed *id.* pp. 7–10 and Ex. 11. I have addressed many of them above in evaluating the Risius Report. The remainder are discussed below.

The bulk of the flaws are alleged to exist in the Risius Report's analysis using the "guideline company method." Gravitt Report, pp. 7–8, ¶ 1. Because Risius ultimately disclaimed any reliance on this method,

---

**13.** I have added this section (b) in response to Def. Reply, pp. 1–13. Given the tenor of defendants' arguments, this change will no doubt be seized upon as evidence of faulty initial analysis in the draft report. Indeed, I am already accused of "under-the-rug sweeping," *see* Def. Reply, p. 12. At the risk of additionally being accused of "backing and filling" (*see* Def. Reply, p. 7), I indulge therefore in a bit of pre-rebuttal here. The guideline company method is useful in the context of the USCC valuation to verifying a range of reasonableness. It did not when Mr. Gravitt used it, and does not now, establish a single measure of value, and I omitted it because it failed in its stated purpose—to justify the result of the Kerrick Report. However, defendants rightly point out that it is a well-regarded method of valuation, and discussing it here I hope disabuses everyone, most notably the Court, of the notion that it was somehow perhaps omitted because I didn't like its results.

no further discussion of these flaws is needed.

The Gravitt Report, at p. 8, ¶ 2, criticizes the Risius Report for failing "to include any analysis of USCC's historical results in its report" and repeats this charge in Ex. 11, ¶ 3. The Risius Report indicates it relied on financial statements for the three years ended December 31, 1993. *See* Risius Report, p. 38, and Exs. B–E. In each instance where projections were made, these results were referred to. *See id.* at 39 (fees for inmate care), 46 (rental income and other income), 47 (total revenue), 49 (depreciation), 50 (officers' compensation), 51 (other salaries and general operating expenses), 52 (total expenses and earnings before interest and taxes), and 53 (earnings before interest, taxes, depreciation and amortization). On this same subject, the Kerrick Report, at p. 166, noted that "we have weighted the most recent years' net earnings more heavily than the prior years' earnings," and the valuation methods based on capitalization of earnings and capitalization of excess earnings placed 80% of the weight on earnings from this same 1991–1993 period; *see id.*, Schs. VIII and IX, pp. 190–91. I find this criticism as a basis to elevate the Kerrick Report over the Risius Report to be not credible.

The Gravitt Report, at p. 9, ¶ 4, criticizes the Risius Report for its valuation of USCC—at $31.2 million—for being less than the Kerrick Report's adjusted asset value for USCC of $34 million. "[T]he adjusted value of its net tangible assets ... would at least establish a minimum value for the Company." *Id.* This statement is true as a theoretical matter, if in fact the Kerrick Report were a true and rigorous assessment of the net asset value method of valuation. There is only one indicated material adjustment of USCC's assets in the Kerrick Report, namely, an increase in value of approximately $30 million of the real estate. *See* Kerrick Report, Sch. VII, p. 189. However, proper application of this method requires specific revaluation of *all* the company's assets and liabilities, and requires *addition* of intangible assets and contingent liabilities not reported on the balance sheet. *See generally* Pratt et al., *supra* at 305–341; Solomon & Saret, *supra,* at 38–41. There is no indication that the Kerrick Report did any of this.

There is also no indication that the Kerrick Report's "Book Value" for December 31, 1993 is reliable. I noted earlier, Part 1(c)(i), *supra* pp. 810–11, that the Kerrick Report materially overstated net income for the year ended December 31, 1993. That overstatement would of course work its way into the balance sheet prepared by Kerrick as well. There are many other discrepancies. The Kerrick Report's book value for total equity is $4.1 million (Kerrick Report Sch. VII, p. 189), while the USCC Financial Statements for December 31, 1993, report total equity at $2.3 million, *and* they report $3.2 million of short-term notes not mentioned on the Kerrick version at all. *See* Risius Report, Addendum 6 (USSC financial statements). Given these kinds of discrepancies, I conclude that the $2.8 million difference between the Risius Report valuation and the Kerrick Report number thus calculated is not material.

The Gravitt Report, at p. 9, ¶ 5, criticizes the Risius Report for projecting net earnings that result in profit margins lower than USCC achieved historically. Yet the Risius Report, on pp. 54–55, states that these projections are substantially above management projections and, in fact, nearly in line with the Kerrick Report on this issue. The Gravitt Report, on p. 9, ¶ 5, concludes that this "anomaly" requires "additional analysis and explanation." I find that the Risius Report, over the sixteen pages preceding the one cited here,

offers substantial explanation for calculation of every element of this net profit.

The Gravitt Report, in Ex. 11, ¶ 5, criticizes the Risius Report for estimating increases in revenues in USCC contracts. It concludes that the Risius Report did not "obtain the information that would have allowed it to determine the appropriate per diem rate." *Id.* However, what the Gravitt Report refers to is the Risis' report estimate of future annual contractual increases in the USCC revenues, which are tied to various rates of inflation. Risius Report, p. 41. Given that the issue is the future rate of inflation that will serve as the basis for the contractual rate increase, it is hard to know where Mr. Risius could look, other than in a crystal ball, to obtain such information. I do not find this criticism credible.

The Gravitt Report, in Ex. 11, ¶ 8, criticizes the Risius Report for making assumptions about renewal of a USCC lease in 1998, rather than determining whether the lease *was* actually renewed. At trial, Mr. Risius defended not examining post-transaction-date information because the industry was volatile. Tr. 2/26/02 16:12—17:5. But more importantly, the job of the analyst is to estimate the value as of the transaction date. *See* Pratt, et al., *supra,* at 29 ("the concept of fair market value means the price at which a transaction could be expected to take place under *conditions existing at the valuation date*") (emphasis in original). It is interesting that the Gravitt Report faults the Risius Report for not peeking ahead to see how things actually turned out in this instance, but at the same time, wants the Risius Report to ignore the actual and substantial payments made to Mr. Todd, *see* Part 2(c)(iv), *supra* pp. 32–33. It cannot be both ways, and I have made consistent determinations herein. I find this criticism of the Risius Report to be not credible.

The remaining paragraphs of the Gravitt Report Ex. 11 are either not material or demand a level of specificity and attention to detail wholly lacking in the Kerrick Report. Standing alone, these might be valid criticisms, but they are not useful as a comparative aid.

### c. Conclusion

I find the Gravitt Report's endorsement of the Kerrick Report's result not credible. I find its criticisms of the Risius Report well-founded and credible as they relate to capital investments, and the payments to Mr. Todd, and not credible in all other respects.

### 4. Cate Elsten

Although I was directed to review the report of Ms. Elsten (Ex. 73), and I have done so, I find no material conclusions regarding value, which is my assignment here. The Elsten Report at p. 2 indicates its purpose is a determination of damages, and Ms. Elsten testified that she was not asked to assess the merits of either the Kerrick or Risius Reports. Tr. 2/25/02 60:18–21.

## II. THE VALUE OF THE USCC STOCK

Based on the above review, for the reasons therein stated, I conclude that the appropriate method for valuing the USCC stock purchased by the ESOP on March 15, 1994, is the discounted cash flow method, with the result to be evaluated by the ranges suggested by the guideline company method. None of the other methods, as applied by the experts herein, were credibly applied to the situation at hand. The discounted cash flow method was used in the Risius Report, and in the Kerrick Report in its calculation of "discounted future earnings—income residual method." However, as I did not find the Kerrick Report estimates credible, I will rely here-

in on the Risius Report adjusted as discussed Part I(B)(3)(iii)-(iv), *supra* pp. 30–33.

## A. Adjustments to the Risius Valuation

The Risius Report discounted cash flow must be modified to account for the additional $1 million capital expenditure which the Risius Report provided for, but which I found was credibly criticized in the Gravitt Report. This amount must be therefore added back to the net cash flows provided in the Risius Report. Table 2 lists the Risius numbers with this sole modification, and the resulting numbers are discounted as they were in the Risius Report. This yields a total value of $55.808 million (in bold).

TABLE 2
ADJUSTED VALUATION FROM RISIUS REPORT
($ thousands, except in Notes)

| | 1995 (Note A) | 1996 | 1997 | 1998 | 1999 | Residual (Note B) | Total |
|---|---|---|---|---|---|---|---|
| 1. Cash flows as reported | 2,674 | 3,255 | 7,987 | 8,963 | 9,255 | 9,550 | |
| 2. Add: $1 million investment subtracted by Risius Report | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 986 | |
| 3. Total (1 + 2) | 3,674 | 4,255 | 8,987 | 9,963 | 10,255 | 10,536 | |
| 4. discount at 17.5% ann. rate | 3,389 | 3,341 | 6,005 | 5,666 | 4,963 | 32,444 | 55,808 |

**Note A. Time periods**

The 12 months ending March 15 of the year indicated. The number at the bottom of this column is $11,000 lower than in the Draft Report due to a math error on my part.

**Note B. Residual value calculation**

Residual value as reported is increased not by $1 million per year, but by $986,000 per year, as the Risius Report assumed that in the long-term, net required capital investment would be equal to the depreciation rate. The residual figure of $10,536,000 was divided by the growth-adjusted discount rate of 14.5% (0.145) resulting in $72,662,000 as the *future* value of the residual, which is then discounted to a present value of $32,444,000 using the 17.5% discount rate applied *at the end of five years*. The other discount rates are applied using the mid-year discounting convention, but this should not be done in discounting the residual period value. *See* Pratt et al., *supra*, at 187–88. Incidentally, all the experts made this same error; I have only corrected it here. This last modification did not appear in the Draft Report.

This figure of $55.808 million compares well with the ranges of values produced by the guideline company method, *see supra* Table 1.

## B. Value of USCC stock purchased by the Plan

This value of $55.808 million represents the value of USCC as of the transaction date. In order to calculate the value of the USCC stock purchased by the Plan, two adjustments are necessary.

### 1. Subtraction of outstanding debt

First, as discussed in detail above (Part I(B)(1)(e)(i), *supra* pp. 814–15), the value of USCC's interest-bearing debt of $18.674 million must be subtracted. Based on USCC's December 31, 1993, audited financial statements, this amount was $18.674 million, which is calculated by taking the total reported debt and subtracting accounts payable, unearned income, and accrued expenses, which do not carry material interest expenses. *See* Risius Report,

Addendum No. 6, p. 839 (USCC Balance Sheet as of Dec. 31, 1993). This subtraction yields $37.13 million as the value for the equity of USCC, which is represented solely by its common stock. As indicated above, I do not believe it is appropriate to subtract the present value of the amounts owed to Mr. Todd. See Part I(B)(2)(c)(iv), supra pp. 32–33.

Defendants suggest that only long-term debt should be subtracted, Def. Reply at 36–37. They present a proper theory, but it is for a different purpose. The argument is that only long-term debt should be included because only it will be present throughout the projection period. We deal here not with a projection period issue, but only the value issue. We have established the total value of USCC. Whether creditors be short-term or long-term, $18.67 of USCC's value belongs to them.

## 2. Reduction to reflect 66% interest purchased

Second, this amount must be reduced because USCC was purchasing 66% of the USCC stock. Therefore the value of the USCC stock purchased by the plan is $37.13 million times 0.66, or $24.51 million.

## C. Marketability discount and control premium

The two common adjustments to the valuation of stock of a closely-held business are: (1) a reduction in value to reflect the fact that the stock may not easily be sold, and (2) an increase in value to reflect the fact that the stock carries with it control of the company. See DOL Prop. Regs. § 2510.3–18(b)(4)(H) and (I), 53 Fed. Reg. at 17,638; Pamela D. Perdue, Qualified Pension and Profit–Sharing Plans ¶ 22.06 at p. 22–38 (2003).

The Kerrick Report, at p. 171, concluded that there should be no discount for lack of marketability, due to the indicated interests of other purchasers in acquiring USCC stock, and because of the required "put option" on stock held by an ESOP. The Risius Report, at p. 61, reached a similar conclusion based also upon the existence of the "put option" as well as the fact that the ESOP's shares represented a controlling interest and "the owner of such interest would have the ability to get liquidity by selling the Company." The Gravitt Report, at p. 6, assumed that the marketability discount and control premium would offset each other.

The DOL Prop. Regs. indicate that "the existence of the 'put' option should be considered for valuation purposes only to the extent it is enforceable and the employer has and may reasonably be expected to continue to have, adequate resources to meet its obligations." 53 Fed.Reg. at 17,636; see, e.g., Eyler v. Commissioner, 88 F.3d 445, 453 (7th Cir.1996) (applying a marketability discount even where a "put option" was present). That requirement notwithstanding, none of the analysts felt such an adjustment was necessary.

The Kerrick Report does not discuss a control premium (Sch. XXI, p. 213, simply assigns a 0% value to it, but there is nothing more). The Risius Report, at p. 61, refers to its valuation as one for a "nonmarketable controlling-interest value," assuming therefore that a control premium has already been impounded. An explicit control premium was added in calculating the values under the "guideline company method," see Risius Report at p. 68, but Risius' use of that method is not at issue here.

Whether a control premium is appropriate is unclear, despite the fact that the ESOP purchased approximately two-thirds of USCC common stock. The DOL Prop. Regs. indicate that "the retention of management and the utilization of corporate officials as plan fiduciaries, when viewed in conjunction with other facts,

may indicate that actual control has not passed to the plan within the meaning of . . . the proposed regulation." DOL Prop. Regs., 53 Fed.Reg. at 17,636. That was indeed the case with the USCC ESOP. In addition, even nominal control may not be worthy of a premium if allocations to plan participants will dissipate control in a short period of time. *Id.; see also* Perdue, *supra,* at p. 22–41; *Foltz v. U.S. News & World Report, Inc.,* 865 F.2d 364, 372–73 (D.C.Cir.), *cert. denied,* 490 U.S. 1108, 109 S.Ct. 3162, 104 L.Ed.2d 1024 (1989) (no need for control premium if ESOP does not plan to sell its control block intact). Again, although the existence of a control premium is unclear on these facts, the only expert to apply such a premium, and then only implicitly, was Risius. If there is an error in that decision, it can only help the defendants by increasing the value of the shares purchased by the ESOP. As the plaintiffs did not complain about this, I do not believe it constitutes an "ambiguity" to be resolved against the defendants under *Gilley.* And even if it were, there is no basis given in the record by which to determine any specific amount or percentage to be extracted from Risius' valuation analysis as a control premium.

### D. Other measures of value

Defendants in their Reply suggest that I consider three additional factors indicating that USCC had a significantly higher value than suggested above. Def. Reply, pp. 14–23. I do so here.

First, I am directed to the valuation done by the Bank of Louisville (BOL), in its role as lender to the USCC ESOP and BOL's implicit endorsement of the Kerrick Report; *id.* at 14–16. BOL ultimately lent the ESOP $34.4 million for this purpose; Mem. Opinion and Order, *supra,* 215 F.Supp.2d at 872. Defendants allege that "[t]he simple fact that the Bank of Louisville went forward with the transaction and risked the millions of dollars of funds it

lent is highly significant objective evidence supporting the approximate value of USCC's stock arrived at by Mr. Kerrick." Def. Reply at 16. However, this conclusion simply does not follow from the objective evidence. It is clear that BOL did substantial investigation of USCC in preparation for its loan and that this work was thorough, competent, and relied on by both Messrs. Kerrick and Risius in their analyses in many respects. It is equally clear that BOL was satisfied with the results enough to put $34.4 million at risk. But, as the Mem. Opinion and Order notes, *supra,* 215 F.Supp.2d at 889, in response to similar arguments made in the liability context, BOL's "most important consideration was that the Bank get paid," and it stood in no fiduciary position to the ESOP. BOL was at risk for $34.4 million. As security for this repayment, BOL had not only the ESOP's assets—66% of outstanding USCC stock—but also a guarantee by USCC itself, in turn secured by substantially all the company's assets. *See* USCC Dec. 31, 1993 Audit Report at 9 (Risius Report Addendum 6, p. 846). It is clear that BOL's risk, while substantial, was different in amount and kind from the venture undertaken by the ESOP. Taken at its full credit, the evidence establishes that BOL was confident that USCC was worth at least $34.4 million. This evidence says nothing more nor less.

Second, the defendants suggest that the actual value as revealed by later transactions indicates a substantially higher value for USCC as of March 1994. Def. Reply, pp. 16–21. This suggestion suffers from logic and math errors, however. The first error is to suggest that future value actually obtained is a measure of the accuracy of a prediction of that value made earlier. One wonders if defendants (and their counsel) are not already fabulously wealthy if they can likewise make today's decisions with tomorrow's information. This is especially true if part of the defen-

dants' math problem is taken into account. They characterize these transactions as "close-in-time" (*id.* p. 17) and "a relatively short time later" (p. 18). One is left to wonder relative to what might this be considered short or close. The transactions in question were three and four years respectively after the ESOP transaction. The full future time horizon of all the experts extended only five years, and with the cushion of risk-adjusted discount rates. As compared with five, clearly three and four are not close to zero. The remainder of defendant's math problem is an exercise in discounting. Taking the first identified transaction, $63 million after three years, if we assume that the $63 million is an accurate measure for USSC three years after the ESOP transaction (Def.Reply, p. 17), then using even the Kerrick's Report unsubstantiated 20% discount rate gives a present value of $36.4 million at the valuation date, and the Risius' Report's 25.6% rate yields $31.8 million. The second transaction, $170 million four years later (Def. Reply pp. 17–18), fares a little better, discounting to between and $68 and $82 million. But this is based on a one-sentence description of the transaction and a hefty four years' passage of time. Giving these numbers the generous and illogical support defendants suggest, they add little credibility. The theory is right, of course; evidence of contemporaneous transactions is some of the best evidence that could be had of value. But these transactions are not contemporaneous. To suggest that the USCC sold after three and four years is comparable to the one extant in March 1994, without more, is not credible, even if the numbers were helpful.

Finally, defendants suggest that there was indeed evidence of contemporaneous offers for USCC. Def. Reply, pp. 21–23.

This of course would be valuable evidence, as defendants properly indicate, *id.*, p. 21 (citing Pratt et al.). There is scant such evidence however. Defendants properly point to the trial and exhibits, but they overlook the Mem. Opinion and Order, *supra* 215 F.Supp.2d at 888, which concludes, already having evaluated that same evidence, that the offers were vague, unsubstantiated, tentative, and even rejected. I do not have such liberty to overlook the Court's prior findings, and conclude that there is no credible evidence of contemporaneous offers.

## III. RESOLUTION OF AMBIGU-ITIES UNDER GILLEY

The preceding analysis resulted in my use of only one valuation method as credible. While there are judgments to be made, assumptions to be suffered, and balances struck, none of this work amounts to anything which is ambiguous. "[T]he fair market value of an asset will ordinarily be identified by a range of valuations rather than a specific, set figure." DOL Prop. Regs., 53 Fed.Reg. at 17,636. The realities of litigation require the Court, and hence my Report, to state just such a "specific, set figure," however. A range of acceptable figures is not an ambiguity. *Secretary of U.S. Dept. of Labor v. Gilley*, 290 F.3d 827, 830 (6th Cir.2002) defined "ambiguous" as "unclear from the record." I find there to be no remaining ambiguities, thus defined, which require invocation of the *Gilley* rule to resolve.

February 12, 2004.

*AMENDED SPECIAL MASTER'S REPORT*

*SUPPLEMENTAL REPORT OF THE SPECIAL MASTER*

## TABLE OF CONTENTS

Introduction ...............................................................835

I. Amended conclusions as to value .........................................836

II. Correction of error in mid-year discounting convention ..........................837

III. Other objections raised by the parties.......................................837
    A.   The equity discount rate ...........................................837
        1.   Component analysis ..........................................838
            a.   The equity risk premium .................................538
            b.   The risk-free rate......................................839
            c.   The company-specific adjustment ..............................839
            d.   Summary .........................................840
        2.   Combination with low cash flow estimates .........................840
        3.   Combination with low growth factor.............................841
        4.   Requirement of independent analysis ............................841
    B.   Subtraction of debt from the value calculated ..........................842
        1.   Failure to subtract debt requires using a lower discount rate .............842
        2.   Only long-term debt should be subtracted ..........................843
        3.   The debt need not be subtracted because it has been repaid.............843
    C.   Other indicators of value ...........................................843
        1.   The "Guideline Company" valuation method..........................843
        2.   Other sales of USCC stock ..................................844
        3.   The Bank of Louisville valuation.................................845
        4.   Modifications to Risius' guideline company method.....................845
        5.   Suggestion of a larger range of values ...........................846
    D.   Treatment of capital expenditures .....................................848
    E.   The use of additional evidence .......................................849

## INTRODUCTION

This matter is before me pursuant to a second order of reference dated May 18, 2004 (Docket No. 249), as supplemented on May 20, 2004 (Docket No. 250). Pursuant to these orders, I am instructed to "address the issues and objections raised by the parties in response to the Final Report entered on February 13, 2004."

The orders direct me to prepare an "Amended Report" or, alternatively, a "Supplemental Report." Thus, some clarification of terminology as it relates to these reports is in order. To provide the clearest record to the Court, I am writing a Supplemental Report to the Final Report dated February 13, 2004 (as amended, Docket No. 238) (hereinafter referred to by its original although now incorrect title,

"Final Report"). This Supplemental Report, taken together with the Final Report, shall constitute the Amended Report. I hope this addresses all the Court's directions regarding the format of the report, and preserves the dialogue with counsel at each step in the preparation of the two reports in this case.

In preparing this Supplemental Report, I have relied upon the following additional documents:

(1) Defendants' Objections to the Report of the Special Master and Motion for a Hearing (March 4, 2004, Docket No. 233) (hereinafter "Def. Obj.")

(2) Response of the Plaintiffs to Defendants' Objections to the Report of the Special Master (March 22, 2004, Docket

No. 235) (hereinafter "Pl. Obj.") [1]

(3) Transcript of the hearing held on May 17, 2004 (Docket No. 252) (hereinafter "Tr. 5/17/04")

(4) Documents filed in court pursuant to the above hearing (Docket No. 248) (hereinafter "Hearing Docs.")

(5) Plaintiffs' Supplemental Brief as to the Objections to the Report of the Special Master (May 27, 2004) (Docket No. 253) (hereinafter "Pl. Supp.")

(6) Defendants' Supplemental Memorandum Addressing the Special Master's February 12, 2004 Report (May 27, 2004) (Docket No. 254) (hereinafter "Def. Supp.")

(7) Letter from Mr. Richards (Plaintiffs' counsel) dated May 28, 2004 (hereinafter "Pl. Ltr."); and

(8) Letter from Ms. Edelman (Defendants' counsel) dated June 3, 2004 (hereinafter "Def. Ltr.").[2]

There are other documents filed after the Final Report, but they relate to the calculation of losses and damages and motions for final judgment which are not material to the valuation issues at hand, and I did not rely on them.[3]

The Draft Supplemental Report is attached as Exhibit B. As before, I have had the benefit of helpful suggestions of both parties, which are referred to as "Pl. Sugg." and "Def. Sugg." and attached as Exhibits C and D hereto.** Also as before, in order to aid the Court on review of these reports, I have indicated in this Report where I have made material changes or additions of the Draft Supplemental Report in response to the Plaintiffs' or Defendants' Suggestions, if the context does not otherwise make that fact clear.

## I. AMENDED CONCLUSIONS AS TO VALUE

I find that the value of the USCC Stock purchased by the ESOP on March 15, 1994 to be **$26.31 million**. This value is $ 1.8 million higher than that of the Final Report, as explained below.

I conclude in Part II below that my modification of the Residual Value in the Final Report was in error, and I have adjusted the total accordingly, as shown in Table 2A below. This yields a total value for USCC of $ 58.532 million.

TABLE 2A (TABLE 2, AMENDED)
ADJUSTED VALUATION FROM RISIUS REPORT
($ thousands, except in Notes)

|  | 1995 (Note A) | 1996 | 1997 | 1998 | 1999 | Residual (Note B) | Total |
|---|---|---|---|---|---|---|---|
| 1. Cash flows as reported | 2,674 | 3,255 | 7,987 | 8,963 | 9,255 | 9,550 | |
| 2. Add: $1 million investment subtracted by Risius Report | 1,000 | 1,000 | · 1,000 | 1,000 | 1,000 | 986 | |

1. Plaintiffs also filed an "Objection to the Final Report of the Special Master" on Mar. 3, 2004 (Docket No. 232), but it contains no additional substantive arguments, but only preserves the objections made in the Plaintiffs' suggestions to the Draft Report. New arguments made by the Plaintiffs appear in the document cited in the text.

2. These letters have not, to my knowledge, been filed with the court. I have appended copies as Exhibit A to this Supplemental Report. [Editor's Note: Deleted for publication purposes]

3. All other documents referred to herein are previously cited in the Final Report.

** Editor's Note: Exhibits deleted for publication purposes.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3. Total (1+2) | 3,674 | 4,255 | 8,987 | 9,963 | 10,255 | 10,536 | |
| 4. discount at 17.5% ann. rate | 3,389 | 3,341 | 6,005 | 5,666 | 4,963 | 35,168 | 58,532 |

**Note A. Time periods**

The 12 months ending March 15 of the year indicated.

**Note B. Residual value calculation**

Residual value as reported is increased not by $1 million per year, but by $986,000 per year, as the Risius Report assumed that in the long-term, net required capital investment would be equal to the depreciation rate. The residual figure of $10,536,000 was divided by the growth-adjusted discount rate of 14.5% (0.145) resulting in $72,662,000 as the *future* value of the residual, which is then discounted to a present value of $35,168,000 using the 17.5% discount rate applied consistently with the mid-year discounting convention as discussed in Part II of this Supplemental Report.

From that must be subtracted the $18.674 million of USCC's outstanding interest-bearing debt, resulting in a total equity value of $39.858 million.[4] The value of the 66% of the stock purchased by the ESOP is, therefore, $39.858 × 0.66 or $26.31 million.[5]

In all other respects, as discussed in Part III below, I conclude that Plaintiffs' and Defendants' further objections are without merit.

## II. CORRECTION OF ERROR IN MID–YEAR DISCOUNTING CONVENTION

In my Final Report, I noted in Table 2, Note B (p. 46), that the "Residual Value" should be discounted as of the *end* of the five-year projection period. All the experts in question used a discount as of the *middle* of the fifth year. It appeared to me that this must have been a mistake, because the receipt of cash flows from the Residual Period does not occur until the end of the fifth year. However, as ex-plained in the Gravitt Affidavit, Def. Obj. Ex. A at ¶¶ 3–5, and in an article cited by Defendants,[6] the experts' discount is appropriate in order to compensate for the fact that the Residual Value was *not* calculated using the mid-year discounting convention. I regret my error, and find credible and persuasive the Defendants' arguments on this point.[7]

## III. OTHER OBJECTIONS RAISED BY THE PARTIES

I have reviewed all of the other objections raised by the parties, and I find that they do not require modification of the conclusions in the Final Report. I have grouped them into five broad categories and I discuss each below.

### A. The equity discount rate

Defendants take issue with my use of the Risius' Report's use of 25.6% as the appropriate equity discount rate. In order to properly frame the analysis which follows, I emphasize at the outset that this is

4. This number is the same as was used in the Final Report. The use of this number is discussed in Part III.B *infra*.

5. Defendants suggest that I have omitted $40,000 from the value, comparing the numbers used in the Original Draft Report with those in the Draft Supplemental Report; *see* Def. Sugg. at 1. Actually, the difference is only $4,000 and is explained by a math error disclosed in the Final Report at 46, Table 2, Note A.

6. Richard M. Duvall, *Mid–Year or End-of-Year Discounting*, 19 BUS. VAL. REV. 208 (2000), reproduced in Def. Supp. Ex. O.

7. I also note that the Plaintiffs' took no position on this matter, Pl. Supp. at 17, perhaps deferentially not calling the error to my attention. In any event, the mistake was mine. I have not charged for my time in reviewing the additional materials and other research on this Part II.

the *only* credible discount rate presented in these proceedings. In the Final Report (pp. 23–24) I have discussed why the discount rate of 20% used in the Kerrick Report is not credible. Defendants' have not challenged this finding, yet continue throughout their arguments to use this 20% rate as an alternative by which to calculate the value of USCC, or as a benchmark by which to judge the credibility of the Risius Report's 25.6% figure. There was and remains no basis upon which to conclude that the 20% is in any way a reasonable discount rate.[8] Defendants raise three basic objections to the 25.6% rate, which I discuss below.

### 1. Component analysis

The calculation of the equity discount rate can be complicated, but it consists of only a few discrete component parts. Each is discussed by the Defendants.

The Final Report (p. 25) notes that the equity discount rate is ordinarily composed of four component parts: a risk-free return, a general equity risk premium, a specific "size" premium reflecting the additional risk attendant to smaller companies, and an adjustment (which could increase or decrease the discount rate) for specific risks attendant to the company in question. For purposes of this analysis I will combine the second and third factors into one "equity premium" component. So, we have three component parts: the risk-free

rate, the equity risk premium, and the specific subject-company adjustment.

It is true that the Risius Report did not indicate how it arrived at the 25.6% total as the sum of these parts, however it did indicate that each of those component parts was considered, *id.* at 26. However, Defendants propose to break down the 25.6% number into its component parts as Mr. Risius might have done, Def. Supp. at 12–15. I note that I consider their analysis only *arguendo*, as Mr. Risius was not asked to respond to this analysis Defendants now seek to attribute to him. I note in each instance below that other inferences might be permissible.

### a. The equity risk premium

Defendants suggest, using data they have surmised is that relied on by Mr. Risius,[9] that the equity risk premium should have been 14.5%. They rely on the data presenting a "smoothed equity risk premium," but they do not clearly specify why the 14.5% is the correct number. This is important because the "unsmoothed" risk premium for this same group of companies is 17.2%; *see* Def. Supp. Ex. D, p. 5. As to their "smoothing," the study's authors state that

> The "smoothed" average premium is the most appropriate indicator for most of the portfolio groups. At the high-value and low-value ends of the range, the average historical premium tends to

---

**8.** It is telling that the Defendants at the May 17 Hearing characterized the Kerrick Report's valuation as "reverse engineering" to reach the result desired by the Defendants. Tr. 5/17/04 24:10–14.

**9.** The Risius Report refers to a study done by Grabowski and King appearing in the Business Valuation Review, but provides no further detail. Defendants have cited and reproduced one Grabowski and King study, *The Size Effect and Equity Returns*, 14 Bus. Val. Rev. 69 (1995), *see* Def. Supp. Ex. D. There

are at least three other articles by the same authors to which Mr. Risius might have been referring, *see New Evidence on Size Effects and Rates of Return*, 15 Bus. Val. Rev. 103 (1996), *Size Effects and Equity Returns: An Update*, 16 Bus. Val. Rev. 22 (1997), and *New Evidence on Equity Returns and Company Risk*, 18 Bus. Val. Rev. 112 (1999). I assume *arguendo* that the defendants have selected the correct study, as further elaborated in Def. Sugg. p. 5 at n.8 and Exhibits D–H thereto.

jump off the smoothed line. At the high-value end ... the smoothed premium may be an inappropriate indicator.

*Id.* at p. 2. This language perhaps suggests but does not require the conclusion that the "smoothed" number would be more appropriate. Defendants reach this conclusion on their own without further justification. Furthermore, the Grabowski and King data are based on exchange-traded companies. It is not clear that USCC meets the criteria for strict comparability with those companies, and an increase in the premium might have been in order for that reason.

**b.   The risk-free rate**

Moving on to the "risk-free" rate, Defendants conclude that a 6.99% rate is the correct rate, Def. Supp. 14 and Ex. E. This figure is well-substantiated and I take no issue with it.[10]

**c.   The company-specific adjustment**

Finally, Defendants look at the company-specific adjustment. It is important, as Defendants note and most experts agree, to be careful not to "double count" uncertainty in this adjustment. Much of the risk to be considered in the valuation has been taken into account by the general equity risk premium, especially as modified, as it is here, for smaller companies. Def. Supp. p. 15 and authorities cited there.

Defendants suggest, having derived the above two components of the risk-free rate to total 21.49%, that the Risius Report makes an impermissible large company-specific adjustment. Defendants cite a treatise which asks the following questions in regard to this company-specific adjustment:

"For example, are the subject company's weaknesses in management depth, geographic and product diversification, breadth of customer base, and other such elements any more limited than the companies from which the size premium was estimated?"

Def. Supp. at 15, *citing* Def. Supp. Ex. G at 125. The Risius Report and Mr. Risius' testimony at trial substantiate that he examined each of these factors, as I noted in my Final Report at 23. Defendants suggestion that Mr. Risius chose to "juice up" the risk premium (Def.Supp. p. 14) is simply epithet masquerading as analysis. Furthermore, the Defendants suggest that this company-specific adjustment should be "only a point or two" (*id.* p. 15). The source cited by Defendants does not *in any way* support this limitation. Higher numbers may in fact be appropriate. Pratt's treatise (cited in my Final Report) uses an example with an investment-specific adjustment of 3%. Shannon P. Pratt, et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies 190 (4th ed.2000).[11]

---

**10.** I have modified this section in response to Defendants Suggestions. In my Draft Supplemental Report, I indicated that the Defendants' evidence was unsubstantiated. Defendants took this to mean that it was without authority, and provided authority for using the long-term Treasury rate on the date of valuation, *see* Def. Sugg. at 6 and Ex. I, which is undoubtedly correct. What I meant was that the evidence was without *authenticity*, meaning there is no indication of its source or veracity. I apologize for the confusion.

Nonetheless, I was able to replicate the number through the website address indicated on the page submitted by Defendants, *see* Def. Supp. Mem. to Final Report, Ex. D, so I take their 6.99% rate as an appropriate one.

**11.** Although it is true that I have concluded the Kerrick Report's analysis is not credible, I must note that it apparently assigned a value of *ten percent* to this factor, *see* Final Report at p. 25.

Assuming that Defendants' calculations are correct, the difference between the 21.49% discount rate calculated thus far and the Risius Report's 25.6% rate is just over four percent, which we can assume would be the company-specific component of the discount rate.[12] The actual adjustment used in the Risius Report could have been lower, but in any event it is not an unreasonable adjustment, and Defendants have offered no credible evidence or arguments otherwise.

#### d. Summary

Defendants' ultimate calculation of 21.49% as the "proper" equity risk premium (Def.Supp. p. 14), while different from the Risius' Report's 25.6% number, is not necessarily better. There could be adjustments of equal or larger magnitude that might raise the rate. We have only the evidence given in the Risius Report. While I have examined the evidence proffered by the Defendants,[13] I find it useful, but not sufficiently persuasive to refute the evidence offered in the Risius Report. Defendants' counsel, though well-qualified attorneys, are not valuation experts. Furthermore, they did not put their rebuttals to Mr. Risius at trial or later. And as noted above, the Kerrick Report's 20% figure, which they continue to use as an alternative, is not a reliable benchmark in any sense.

#### 2. Combination with low cash flow estimates

Defendants allege that the Risius Report's evaluation is flawed because it impermissibly takes "double account" of the riskiness of USCC, by making unreasonably low estimates of cash flow and then by using an unreasonably high discount rate. Def. Supp. at 18–20. It is true, as Defendants' authorities indicate, that it is important for the valuator to avoid "double counting" the risk in this fashion. *Id.;* Pratt, *supra* at 181 ("The analyst must be especially careful to avoid undue double counting, such as reflecting a negative factor fully by a reduction in the same economic income projection, and then magnifying the effect by an increase in the discount rate—for the negative factor."). Defendants indicate the Risius Report assumed no growth projected in future contracts, and that USCC facilities would operate at less than full capacity. See Def. Sugg. at 8.[14] In my Final Report, I noted that the Risius Report provides detailed projections of USCC's revenues and expenses for each of the five years and the terminal period. Final Report, at pp. 20–21 and sources cited. My finding as to the Risius Report's cash flow estimates are unchanged.

---

12. I use qualifiers throughout this discussion not because Defendants' points are not valid, indeed they are. I emphasize only that we are hypothesizing about what Mr. Risius *might have* meant by his conclusions.

13. As to the propriety of considering additional evidence, *see infra* in Part III.E.

14. Defendants further suggest, *id.,* that USCC's business bears *no risk at all* and should be discounted at the same rate as obligations of the U.S. Government. The differences between this small company and the government (with its monopoly on the ability to print currency) should be obvious. Furthermore, Defendants seem to equate long-term contracts with money in the bank, as having "no possibility of default." *Id* at 8; *id.* at 4 ("there was little or no risk that USCC's contracts with governmental entities would go unpaid"). This disregards uncertainties that exist in any contract about the parties' ability and willingness to perform. One need only recall Enron's long-term gas and fiber-optic contracts, booked as revenue, to understand the types of business uncertainties involved in even the best contracts in the most "stable" of industries.

### 3. Combination with low growth factor

Defendants further allege that there is "triple counting" in the Risius Report, because the Report in addition uses an unreasonably low growth rate of 3% applied to the terminal period. Def. Supp. at 19, Def. Sugg. at 8. Again, in the Final Report I summarized the proper use of the terminal period growth rate—to reflect the growth in nominal earnings, not business growth. Final Report at pp. 28–29. This growth factor represents essentially a long-term inflation rate, not an estimate of business growth. My finding as to the Risius' Report's proper use of this factor is unchanged.

### 4. Requirement of independent analysis

Defendants exhort me to engage in an independent review of each part of the valuation analysis for USCC and not simply rely on the Risius Report as the only report with credibility. See Def. Supp. at 2 (cash flows), 4 (discount rate).

The Final Report at pp. 20–33 and 41–44 deals critically with the Risius Report in all the major areas identified by Defendants and by the Gravitt Report. Defendants have focused on three assumptions in the Risius Report they find particularly objectionable: (1) that the rate of growth of contract prices was limited to 3%, (2) that the facilities would be operated at less than full capacity, and (3) that USCC would be operated in a "steady state" with no new contracts or opportunities for further profit. See Def. Supp. at 3.

As to the three percent growth rate in contract prices, the Risius Report credibly assumed that this was the limit of the increase that the governments contracting with USCC would permit in their prices each year. The Report explains that this is a reasonable assumption, given the nature of these contracts. See Risius Report at 41.

As to operation at less than full capacity, only the Kerrick Report assumed 100% occupancy; the Risius Report averaged the estimates of the Kerrick Report and others, see id. at Ex. H. This is far from what Defendants (Def.Supp. p. 3) allege to be "unsupported and unjustifiably conservative."

Finally, there is the matter of new business. Surely an evaluator should take into account all credible evidence that the business at hand will expand into other areas, businesses, opportunities, and the like. The Risius Report did estimate revenues, costs, and cash flows from three projects— Otter Creek, Gadsden, and Diboll—which were either newly completed or *still under construction* as of the valuation date. See Risius Report at 42–45. As to further business opportunities, Defendants suggest that more revenues should have been provided because the market was optimistic about the industry, Def. Supp. at 3. However, it would be improper to add revenues and net profits based on future business that the company *might* obtain, without the benefit of evidence. USCC was not engaged in consumer-type sales such that increases in product sales might be smoothly forecasted; its business was based predominantly on large, discrete, nonuniform contracts. The inherently unpredictable nature of this business is self-evident. Defendants suggest that more revenues should be added because USCC might have other contracts or might find them. Indeed, projections submitted by Defendants, Def. Sugg. Ex. C, which appear to be the basis for the Kerrick Report's forecasts, provide, beginning in 1996, for "the start-up of a new contract for [a] prospective prison in either Florida or Texas." *Id.* at p. 1309. There is no evidence cited of the existence of further

negotiations or opportunities in either state, nor an analysis of the financial ability of USCC support such expansion.[15] Although such business forecasting is important for strategic management and future planning, hoped-for business without a more sound foundation cannot be part of a valuation analysis.

Moreover, Defendants' exhortation that I am to independently (Def. Sugg. at 2) determine USCC's value goes beyond my charge from the Court, as I read it. *See* Final Report at 5. Indeed, the word "independent," used many times by the Defendants, does not appear in the Order of Reference. It is true that I was not directed to choose one valuation or the other, but I have not done so. I have critically reviewed each of the valuations presented, and I have made significant modifications to the Risius numbers, as explained in detail in the Final Report. Defendants' suggestion that I have "adpot[ed] Risius by default" (Def. Sugg. at 2) is inaccurate. In addition, in this Supplemental Report I have provided further discussion and comparison with the Kerrick Report numbers. I believe this adequately discharges the requirements of the Order of Reference.

## B. Subtraction of debt from the value calculated

In my Final Report, I indicated that the failure of the Kerrick Report to subtract the value of the debt owed by USCC from the value of the company determined by the discounted cash flow method was the "single most important issue" in the valuation of USCC. Final Report at 15–17 and authorities cited. Defendants offer three further defenses of the Kerrick Report's refusal to subtract debt. None of these

take issue with the rationale or authorities cited in the Final Report.

### 1. Failure to subtract debt requires using a lower discount rate

First, Defendants suggest that, if debt is to be subtracted from the Kerrick Report's valuation, then a lower discount rate should be used for the Kerrick Report's projected cash flows, in order to properly apply the "Weighted Average Cost of Capital" or WACC method. Def. Obj. at 17–18, citing additional affidavit of Mr. Gravitt at ¶ 7. It is true, as Defendants suggest, that the discount rate to be used should be based on the WACC method, which calculates a cost of debt *and* a cost of equity (the latter discussed *supra* Pt. III.A), and calculates a weighted average of the two based on the company's capital structure. See Final Report at 21 & 27–28. The Risius Report used a WACC discount rate of 17.5%. The Kerrick Report used a 20% discount rate which, if it was an equity discount rate only, was improperly high, as Defendants note. However, an equally plausible conclusion, since the Kerrick Report did not justify the 20% discount rate used, is that it actually *was* supposed to be the WACC number, weighted for the lower cost of USSC's debt, and therefore the Kerrick Report's cost of equity capital figure may have actually been *higher* than that of the Risius Report. We are left only to wonder, because the Kerrick Report provided no details about how the 20% rate was chosen to be applied to the overall cash flows of USCC. The Kerrick Report numbers are irrelevant as a basis for comparison in any event, as noted *supra* Part III.A.

---

**15.** This amount for the hypothetical new prison contract, approximately $5.5 million in revenues the first year, accounts for the bulk of the difference between the forecasts of the Risius and Kerrick Reports, and both are significantly above management's forecasts. *See* Risius Report at 47 ("Total Revenue Comparison").

### 2. Only long-term debt should be subtracted

Second, Defendants suggest that, if debt is to be subtracted, only USCC's long-term debt should be subtracted, and that is unquestionably a lower number than the $18.674 million I used, *see supra* Pt. I. However, Defendants' assertion is not supported by the evidence they cite, *see* Def. Supp. Ex. F at p. 40 (indicating that the decision of whether to include short-term debt as well is "a matter of the analyst's judgment"). In addition, this matter was raised and disposed of in my Final Report at p. 47, and Defendants raise no new objections.

### 3. The debt need not be subtracted because it has been repaid

Finally, Defendants make the new argument that the USCC debt does not have to be subtracted because it no longer exists. Def. Supp. at 26–28. Defendants cite no authority for this proposition, which flies in the face of the well-settled rule that the valuation of a company for ESOP purposes is to be done of the company as it exists *before* the ESOP purchase takes place. *See* Final Report at 32 and authorities cited (discussing this issue in a different context, but equally applicable here). Defendants' hypothetical, Def. Supp. p. 28 n. 21, is plainly misleading in suggesting that the company should be valued after the injection of new capital by the ESOP.[16] Likewise, Def. Sugg. at 8 posits that a different (greater) value can be placed upon USCC if the additional money paid by the ESOP into the company is considered.

These arguments fall prey to the temptation to calculate value based on the amount paid for the stock. Rather, the value of USCC is determined, as explained in the Final Report at 4–5, by looking at the company's future economic benefits and discounting those back to a present value. That total value does *not* belong to the company's equity holders so long as debt remains to be paid, so the value of the debt must be subtracted. While it is true that the ESOP added new capital to USCC, the effect of this transaction is simply to increase the percentage of the company's value attributable to the ESOP.[17] The additional investment by the ESOP is surely relevant in determining damages, but that is not my charge here. It is fundamentally clear that when the ESOP purchased more shares of USCC it did not change the value of USCC, regardless of what was done with that money. It simply gave the ESOP a bigger slice of the pie. Defendants argument on this point contradicts settled valuation theory and the experts in this case.[18]

### C. Other indicators of value

Defendants renew their objections, all made and answered in the Final Report, that I must consider and find as persuasive a variety of other numbers suggesting a higher value for the USCC stock purchased by the ESOP. I deal with each of these repeated objections here.

### 1. The "Guideline Company" valuation method

Defendants allege that Table 1 in the Final Report (p. 39) is flawed because it

---

16. Th remainder of this section has been rewritten in response to Def. Sugg. at 8.

17. For example, if the ESOP's purchase of Mr. Todd's shares were considered in isolation, as suggested by Def. Sugg. at 8, then only 46.875% of the company's value would belong to the ESOP.

18. The Risius and Gravitt Reports both subtracted the debt as I have done here. The Kerrick Report did not, but Mr. Kerrick's testimony on this point is not in line with Defendants' counsel's new theory put forward here, *see* Final Report at 16–17.

considers stock prices of the guideline companies as of December 31, 1993 *and* as of March 15, 1994. Def. Supp. at 5–6, Def. Obj. at 10. The difference is important, because the prices on the latter date were substantially higher, see Final Report at 36. They mention twice that the fact that the market for private prison companies was rising is highly relevant and probative, and should be considered. Def. Supp. at 5, Def. Obj. at 10. They suggest that I have "ignored" the higher values and my conclusion regarding the guideline companies, therefore, is not credible. *Id.*

Defendants may have misunderstood my conclusion, and their argument has math problems. I agreed that the March 15, 1994 closing prices for publicly-traded companies are highly relevant and probative. I so noted in my Final Report àt 36–37. These prices, however, are not *alone* dispositive, however, for reasons I cited in my Final Report.[19] They have a math problem in suggesting that the range of guideline company values in Table 1 ($42 to $48 million on the low end and $65 to $73 million on the high end) does not support my valuation of $37 million. Def. Supp. at 6. However, the relevant number from the Final Report for comparison is not $37 million, which is the value of USCC shorn of its debt, but the $55.8 million figure from Table 2 (adjusted to $58.5 million in Table 2A *supra* ), which is the "apples to apples" comparison. Making this adjustment, we find a lower range of guideline company values of $42 to $48 million, a discounted cash flow value of $58.5 million, and a higher range of guideline company values of $65 to $73 million. The guideline company analysis does in fact support the discounted cash flow analysis, as I noted in the Final Report at 39.

### 2. Other sales of USCC stock

Defendants renew their objection, analyzed and answered in the Final Report at 50–51, that failed and nebulous contemporaneous offers and much later consummated transactions in USCC stock must be considered as indicative of value. Def. Obj. 4–5. Again, Defendants suggest that because I disagree with their arguments, I have ignored them. And this is again not the case. I agreed with Defendants' general proposition in my Final Report at 51, noting that "evidence of contemporaneous transactions is some of the best evidence that can be had of value." However, I continued: "[t]o suggest that the USCC sold after three and four years is comparable to the one extant in March 1994, without more, is not credible" and that "there is no credible evidence of contemporaneous offers." *Id.* That remains the case.

Defendants cite authority (Def.Obj.4–5) suggesting that I must take post-valuation sales into account as dispositive of value. *Estate of Kaplin v. Commissioner,* 748 F.2d 1109 (6th Cir.1984) and *Estate of Jung v. Commissioner,* 101 T.C. 412, 1993 WL 460544 (1993). However, those cases are easily distinguishable from the facts at hand. The court in *Kaplin* commanded that a post-valuation sale of the subject property be taken into account, but noted that the property at issue was one parcel of real property in essentially the same condition as existed as of the valuation date. *Kaplin,* 748 F.2d at 1111. Here, there is not the faintest resemblance between USCC stock in 1994 and USCC stock three or four years later. And the court in *Jung* made a similar observation:

> Of course, appropriate adjustments must be made to take account of differences between the valuation date and the dates of the later-occurring

---

**19.** I have removed the latter part of this sentence which stated that Defendants did not dispute my reasoning on this point, in response to Def. Sugg. at 9.

events . . . . . . Although any such changes must be accounted for in determining the evidentiary weight to be given to the later-occurring events, those changes ordinarily are not justification for ignoring the later-occurring events. *Jung,* 101 T.C. at 431. Because I did not find the evidence of contemporaneous offers or later sales credible, the Defendants suggest that I ignored it (or even "made a point to ignore" the rules cited above), Def. Obj. 5–6 and Ex. B (Martin Affidavit) at ¶ 5. On the contrary, the rules were applied in my Final Report, but they did not work in Defendants' favor then, and they do not still.

### 3. The Bank of Louisville evaluation [20]

Defendants allege that the Bank of Louisville (BOL) evaluation of USCC, allegedly for approximately $62 million, is compelling evidence of a higher value for the USCC stock purchased by the ESOP. Def. Obj. 10–12, Def. Supp. 8–9. Shorn of an advocate's hyperbole,[21] the allegations present nothing new. When I stated in the Final Report that BOL's evaluation shows only that USCC was worth at least $34.4 million (Final Report at 50), I meant only that. Of course, as Defendants suggest (Def. Obj. 11, Def. Supp. 9, Tr. 5/17/04 33:11—34:5), BOL probably believed there was more value than that in USCC,[22] but that is not relevant for our purposes because it was not relevant for theirs. A lender needs to be satisfied that a loan will be repaid according to its terms, and that in the event that repayment cannot be so made, that any collateral offered will be realizable for the remaining unpaid balance. Here, BOL undoubtedly looked at USCC's ability to fund the ESOP so that the loan could be repaid, and looked at the value of USCC's stock held by the ESOP, and the value of the USCC underlying assets, to which it had a secured claim. The nature of a lender's inquiry and analysis is so fundamentally different that it is simply not credible to equate it with the analysis of value of stock purchased by the ESOP.

It is also true, as Plaintiffs note (Pl. Supp.16), that I was not directed to consider the BOL evaluation as an expert opinion. I have chosen out of caution to consider it for the purposes suggested by the Defendants, but their argument is not persuasive. The BOL evaluation is good and careful work, as I noted in my Final Report, but it is for a decidedly different purpose, and it cannot bear the additional weight the Defendants seek to place upon it.

### 4. Modifications to Risius' guideline company method

Defendants allege that the Risius Report is disingenuous when it initially (and erroneously) applied the guideline company method, but then discarded reliance on that method when it shows results which were wildly out of line with the discounted cash flow analysis. Def. Obj. 8–10, Def. Supp. 7. Taking the correct data, the Defendants demonstrate that the Risius Report's guideline company method would indicate a value for the USCC stock of around $105 million. Gravitt Report, Ex.

---

**20.** I have changed this word from "valuation" to "evaluation" in this section, in response to Pl. Sugg. at 3–4.

**21.** For example, that I am suggesting that BOL would violate federal law or falsify a lending valuation, Def. Obj. at 12, Def. Supp. at 9, or that I suggested that BOL thought USCC was worth only $34.4 million, Tr. 5/17/04 33:11–24.

**22.** Defendants cite to federal loan-to-value requirements, Def. Obj. at 11–12, but do not explain why those regulations, which govern real estate loans, would be directly applicable here to a loan secured by stock.

8. Because Defendants continue to make much of this error, I am compelled to address it here.[23]

First, although Defendants trumpet this $105 million number many times, they admit that the Risius Report never used or endorsed this number. Rather, when confronted with his mistaken calculation, Mr. Risius abandoned use of the guideline company method. Although Defendants make much of this change in position, it is clear that Mr. Risius admitted his error and discussed how the correct data impact his work. See Risius Aff. Ex. 4, pp. 3–4. Defendants suggest that this impairs the weight to be given to the Risius Report's guideline company valuation. It may well do that, but the Risius Report did not rely on the guideline company valuation method at all. Defendants further suggest, without foundation, that this change might suggest that Mr. Risius is not telling the truth. See Def. Supp. at 7, Tr. 5/17/04 22:10–19. I find no basis to so conclude.[24] In any event, the error and the Risius Report's change in reliance on the guideline company method did not impact the Report's other conclusions.

Second, Defendants' own expert, Mr. Gravitt, used the guideline company method to arrive at a value of about $54.5 million. Gravitt Report Ex. 7. He used median numbers, as did I in the Final Report Table I for the reasons there stated (Final Report at 38 n.12 and 39). I note that, if median numbers are used in calculating the multiples, as the Gravitt Report did, Mr. Risius' mistake becomes irrelevant, since the lowest and highest values would be discarded in any event. But that is beside the point here; Defen-

dants do not back away from their own expert's guideline company valuation.

And finally, though Defendants' have used this $105 million number to attack the Risius Report's *credibility*, which is appropriate, they have continued to trumpet the figure as somehow relevant to the *value of USCC stock*, which is not appropriate. Defendants admit as much in a moment of candor, see Tr. 5/17/04 29:16–17 ("Now, that's invalid. I will grant you that's invalid.").

### 5. Suggestion of a larger range of values

Defendants have further suggested, for the first time at the May 17 hearing, that this case is difficult because such a wide range of numbers is presented. Defendants presented the court with a sheet of numbers, see Hearing Docs. p. 1. The purpose of this document was unclear. Defendants first argued that

> Mr. Risius is absolutely at the bottom of that range. Ironically, the Master's final recommendation is the second low number. And when you get into the middle ... and I think if the court looks back at that testimony and judges the credibility of any of those issues and does its own calculation, you are likely to end up in that range [around $46 to $49 million].

Tr. 5/17/04 30:5–13. Later, after questioning by the Court, Defendants note they are not "arguing for those [numbers] so much as to illustrate [the] credibility issue" and they are "not stipulating that that's the right number." *Id.* at 31:2–4 and 31:6–7. Thus, it is unclear what to make of this

---

23. Defendants also suggest that I "refused to consider or address the findings of the Michigan Public Service Commission on Mr. Risius' credibility." I referred to these issues in the Final Report at 33 n.10, where I concluded that Mr. Risius adequately refuted these credibility attacks at trial.

24. No more so, in any event, than Mr. Kerrick's "reverse engineering" of his numbers, see *supra* note 7, suggests that any of his testimony is not truthful, and I did not assume that it was anything other than truthful.

sheet of numbers. As explained below, I conclude that it does not create any uncertainty.

Defendants are correct to note that business valuation is a subjective and uncertain process. Properly done, however, reasonable assumptions will result in an appropriate range of acceptable values. Neither I nor the Court, however, are at liberty to render a "range" of values as our result; *see* Final Report at 52. Furthermore, Defendants are incorrect in suggesting that because there is subjectivity, there is an impenetrable permanent fog which creates a fuzzy range of numbers.

Defendants' sheet of numbers has exhumed a number of issues previously laid to rest, and has incorrectly calculated many of those numbers. Cleanup and reburial can be a messy process, but I proceed nonetheless. In Table 3 below, I adjust the Defendants' sheet of numbers in three important respects. First, I have identified in the comment area those numbers prepared by the Defendants which use the Kerrick Report's unsubstantiated 20% discount rate. Second, I have identified with bold italics those numbers which were changed—reduced by $18.6 million— in order to compare "apples to apples," that is, the value of USCC common stock, not the market value of invested capital. Finally, I have underlined the numbers prepared with discounted cash flow analysis using the substantiated 25.6% discount rate.

### TABLE 3. DEFENDANTS' "RANGE OF VALUES" PRESENTATION

Numbers are taken from chart presented at trial, Hearing Docs. at p. 1, except as indicated below Numbers in **underlined bold** represent discounted cash flow analysis with substantiated discount rates. Numbers in *bold italics* have been reduced by $18.6 million, subtracting USCC's outstanding debt, in order to make the numbers comparable to the others presented.

| $ Mill. | Source | Comments |
|---|---|---|
| 102 | Risius Guideline Company approach adjusted by Defendants | Guideline values; for validation purposes only (Not prepared by Risius) |
| *54.6* | My Guideline Co. approach—March '94 prices (high end) | Guideline values; for validation purposes only |
| *46.1* | My Guideline Co. approach—March '94 prices (low end) | Guideline values; for validation purposes only |
| 62.3 | Bank of Louisville valuation | Valuation for a different purpose |
| 59.8 | My valuation using an alternate 20% equity discount rate | The 20% rate is unsubstantiated |
| 54 | Gravitt Guideline Co. approach—median value | Guideline values; for validation purposes only |
| *33.6* | Kerrick valuation | Already disclaimed by all; the 20% rate is unsubstantiated. |
| 49.3 | Risius DCF approach using a 20% discount rate | The 20% rate is unsubstantiated |
| *29.3* | My Guideline Co. approach—Dec. '93 prices (high end) | Guideline values; for validation purposes only |
| 46.6 | Risius' Guideline Co. approach—corrected by Gravitt | Guideline values; for validation purposes only |
| **42.87** | My report changed in two respects | Only one change is appropriate |
| *23.8* | My Guideline Co. approach—Dec. '93 prices (low end) | Guideline values; for validation purposes only |
| **40.13** | My report changed in one respect | Incorrect change |
| **39.87** | My draft report | Near this Supplemental Report's value of 39.858 |
| **37.13** | My final report | Corrected as stated above in Pt. I |

| 31.2 | Risius DCF approach | Adjusted in final report |
|---|---|---|

Now, having made those changes to make the numbers comparable, in Table 4 below I re-sort the numbers in numerical order, and remove (1) those based on a 20% discount rate and (2) those based on a valuation subtracting only long-term debt instead of all interest-bearing debt.[25]

**TABLE 4. TABLE 3 IN NUMERICAL ORDER AND REMOVING VALUATIONS SUBTRACTING ONLY LONG–TERM DEBT AND VALUATIONS USING THE 20% DISCOUNT RATE**

| $ Mill. | Source | Comments |
|---|---|---|
| 102 | Risius Guideline Company approach adjusted by Defendants | Guideline values; for validation purposes only (Not prepared by Risius) |
| 62.3 | Bank of Louisville valuation | Valuation for a different purpose |
| *54.6* | My Guideline Co. approach—March '94 prices (high end) | Guideline values; for validation purposes only |
| 54 | Gravitt Guideline Co. approach—median value | Guideline values; for validation purposes only |
| 46.6 | Risius' Guideline Co. approach—corrected by Gravitt | Guideline values; for validation purposes only |
| *46.1* | My Guideline Co. approach—March '94 prices (low end) | Guideline values; for validation purposes only |
| 39.87 | My draft report | Near this Supplemental Report's value of 39.858 |
| 37.13 | My final report | Corrected as stated above in Pt. I |
| 31.2 | Risius DCF approach | Adjusted in final report |
| *29.3* | My Guideline Co. approach—Dec. '93 prices (high end) | Guideline values; for validation purposes only |
| *23.8* | My Guideline Co. approach—Dec. '93 prices (low end) | Guideline values; for validation purposes only |

These numbers permit some important conclusions as the fog lifts. First, the Risius Report's guideline company valuation and the BOL valuation appear as distant outliers from the relevant numbers, as they should. Second, the entire range of relevant values is much smaller.[26] Finally, and most importantly, the range of calculated discounted cash flow values—the only method credibly used by any expert in this case to directly value USCC stock—is only from $31.2 to $39.9 million. I hope that this modification of the Defendants sheet of numbers reassures the Court that the properly rendered facts are not unclear at all.

## D. Treatment of Capital Expenditures

In my discounted cash flow analysis, Table 2 and 2A, *supra*, I added back to the cash flows of the Risius Report amounts deducted in that Report for capital expenditures. Plaintiffs allege that the Final Report ignores a strong factual basis for reducing cash flows for capital expendi-

**25.** Defendants' allegation that only long-term debt should be subtracted was considered and refuted *supra* part III.B.2.

**26.** See *supra* Pt. III.C.1, demonstrating that the discounted cash flow values do in fact fit between the upper and lower ranges of value suggested by the guideline company method.

tures, Pl. Supp. 4–7. I made those modifications of the Risius Report's numbers because there were no facts supporting the Risius' Report's estimates, although the theoretical basis for providing for capital expenditures is well-established. Final Report at 30–31.

Plaintiffs "strong factual basis," Pl. Supp. 4–7, consists of demonstrating that there is a factual basis for assuming that capital expenditures would be required. I conceded this in the Final Report at 31, but noted that there was then (and remains still) no factual basis for the Risius Report's $1 million figure. In addition, Plaintiffs reiterate the point that in the residual period, capital expenditures are often assumed to be equal to depreciation expense, Pl. Supp. 5. However, the costs and values of USCC's properties were rising, so accounting historical costs, upon which depreciation is based, may not reflect current values at all. Furthermore, this "steady state" is five years beyond USCC's then most recent operations in 1994. Many things about USCC's operations and capital budgeting were expected to change.

In sum, I do not disagree with Plaintiffs that some reduction for capital expenditures would probably be appropriate. But as I stated in the Final Report, there is no basis upon which to conclude that the unsubstantiated numbers propounded in the Risius Report are relevant.

Plaintiffs in their latest submission, Pl. Sugg. at 2–3, note that the failure to provide for new capital expenditures would logically mean that USCC's depreciation expense would not continue into perpetuity, as the residual period cash flows assume, but would end at some point in the future. Plaintiffs have recalculated the residual period cash flows, assuming that USCC would no longer have depreciation

expenses, which would result in a higher income tax expenses and a lower net value for USCC (see Pl. Sugg, Attachment A–3). However compelling their logic, Plaintiffs overstate the effect of this adjustment. Depreciation deductions will continue to be available to USCC to the extent that it retains depreciable assets with remaining undepreciated value. The company's 1993 balance sheet indicates that depreciable property has a net book value of about $18.54 million (USCC Dec. 31, 1993 Financial Statements at 2), with remaining estimated useful lives ranging from 3 to 40 years (id. at 6, Note 1). Of this amount, approximately $4.74 million is accounted for by depreciation allowances in the projection period, leaving an estimated net value of approximately $13.8 million of available depreciation deductions (assuming no salvage value). Thus, the residual period's depreciation charge of $985,838 (see Pl. Sugg. Attachment A–1, Row 2, final column) could be continued for approximately 14 more years without exhausting USCC's depreciable base. By that point, nearly 20 years into the projection period, any further adjustment to the cash flows is rendered negligible by the 17.5% discount rate, which will reduce any change to a trivial amount.[27] Therefore, even assuming the accuracy of Plaintiffs' argument, I conclude that no further adjustment is required.

### E. The use of additional evidence

Plaintiffs have objected to the Defendants' use of additional evidence, particularly the submission of additional affidavits from experts, Pl. Obj. at 2 and 6–7; Pl. Ltr. Defendants, on the other hand, argue that it is permissible to look at materials outside the record, and additional testimony. Def. Supp. at 18, Def. Ltr.

27. The present value of $1 at the end of 20 years at a 17.5% discount rate is 3.9¢.

■ The ability of a Special Master to conduct hearings or take evidence exists only to the extent permitted in the order of reference.[28] The Court's initial Orders of Reference are reproduced in pertinent part in the Final Report at 1. I was directed to review the testimony of four named experts and issue a report finding the value of USCC. I did not interpret this as authority to conduct hearings or require or take additional evidence, and none of the parties asked me to do so. It is entirely appropriate, in my opinion, for me to research and refer to treatises and other legal and nonlegal authorities, and for the parties to do so in their suggestions and objections to my report.[29] It is another matter for me to receive further affidavits in the nature of additional testimony, which Defendants have offered and to which Plaintiffs object. I do not believe the Orders of Reference are entirely clear in this respect. However, in order to preserve the utility and integrity of my Reports upon review by the Court, I have determined to consider *all* the materials submitted by both sides. It is true that the submission of affidavits by Messrs. Gravitt and Martin (Def. Supp. Exs. A and B) did not provide the Plaintiffs the opportunity to cross-examine those witnesses. However, I have noted in each relevant respect in this Supplemental Report my responses to each item mentioned in the affidavits.[30] With the exception of the modification made in Part II of this Supplemental Report, I find the additional evidence submitted by both sides to be unpersuasive, as indicated in Part III of this Report. If the Court should ultimately decide that the evidence objected to by the Plaintiff should not have been considered, I hereby find that this testimony, although considered, would not alter my Report or this Supplemental Report.[31]

*Exhibits\*\*\**

A—Letters from Plaintiffs' and Defendants' Counsel

---

28. Neither old Rule 53(c) nor new Rule 53(b) or (c) are instructive as default rules, but indicate that my authority is bounded (both permissively and restrictively) by the Court's Orders of Reference. See 215 F.R.D. 158, 311–38 (Eff. Dec. 1, 2003).

29. I note, however, that only the Plaintiffs have properly sworn as to the authenticity of their documents.

30. I have responded to the specific items mentioned in the new Gravitt affidavit in Parts II and III.A and above. I have responded to the specific items mentioned in the Martin affidavit where it is cited in this Supplemental Report. Overall, although Mr. Martin's qualifications as an appraiser and expert appear noteworthy, his conclusions are based only on his review of my Draft and Final Report and only repeat conclusory allegations Defendants have themselves made and to which I have responded fully.

31. As Defendants are prone to suggest that because I disagreed with a point of theirs that I did not or refused to consider it, I note that I did consider each point raised and have responded to each herein. Furthermore, Defendants have insinuated many times that I used a compressed time schedule to prepare both the Draft and Final Reports and therefore I could not have competently reviewed their numerous arguments. With respect to preparation of the Draft Report, the number of hours was completely in line with my estimate given the Court and the parties prior to my appointment. That the reported billed hours were compressed into the Christmas holidays reflects many hours of background reading and research for which I did not charge done earlier in the six month period, and the realities of academic life. With respect to the preparation of the Final Report, defendants suggest that I could not have possibly carefully read and reviewed their arguments in the 25 hours I allocated to that task. They have not, however, pointed out an argument of theirs to which I failed to respond (as opposed to finding it unpersuasive).

\*\*\* Editor's Note: Exhibits deleted for publication purposes.

B   Draft Supplemental Report
C   Plaintiffs' Suggestions
D   Defendants' Suggestions
July 22, 2004.